TRI–STATE GENERATION AND TRANSMISSION COMPANY, Gerico, Inc., and Frostline, Inc., Plaintiffs-Appellants,

v.

The CITY OF THORNTON, a municipality, and the Mountain States Telephone and Telegraph Company, a Colorado corporation, Defendants-Appellees.

No. 81SA269.

Supreme Court of Colorado, En Banc.

July 6, 1982.

**672**

David Berger, Kent Denzel, Commerce City, for plaintiffs-appellants.

Katherine T. Coolidge, City Atty., Thornton, Leonard McCain, Brighton, for The City of Thornton.

Cheryl T. Flanagan, Bruce Smith, Mountain Bell Law Dept., Denver, for Mountain States Tel. and Tel. Co.

LOHR, Justice.

Tri-State Generation and Transmission Company; Gerico, Inc.; and Frostline, Inc., seek review of a judgment of the Adams County District Court dismissing their complaint, brought after the City of Thornton (Thornton) granted the application of The Mountain States Telephone and Telegraph Company (Mountain Bell) for rezoning of a parcel of land as a Planned Unit Development (PUD) district. The complaint sought

review of the action of the Thornton City Council, challenged the constitutionality of the Thornton PUD ordinance, and requested injunctive relief prohibiting construction of the Mountain Bell building because it allegedly would violate protective covenants applicable to the site. We affirm the judgment of the trial court.

In early 1979 Mountain Bell applied to the Thornton City Council for rezoning of approximately twelve acres of land located in the Washington Square Business Park. At the time of the application most of the subject property was zoned as Industrial District 1 (I–1); the remainder was in a Restricted Service District (C–4) zone. Mountain Bell sought reclassification of the entire parcel as a PUD district.

Mountain Bell proposed to use the site for construction of a corporate processing center. The Mountain Bell PUD application reflects that the center was to be a seven-story structure approximately 120 feet in height, and was to have 505 parking spaces and employ 884 people. The proposed Mountain Bell facility would have conflicted with the height limitations and parking requirements applicable to the C–4 and I–1 zones. In a C–4 zone the height limitation is 60 feet and in an I–1 zone the maximum permissible height is 40 feet. Under the applicable zoning regulations, a structure of the size and type proposed by Mountain Bell also would have been required to include 735 parking spaces rather than the 505 spaces proposed by Mountain Bell.[1] However, Mountain Bell's PUD plan also provided for a greater setback of the structure from the site's property lines than that specified in C–4 and I–1 zones, and included design amenities not required by Thornton's zoning regulations.

The Thornton Planning Commission held a hearing on Mountain Bell's PUD application. Tri-State Generation and Transmission Company, which occupied a three-story office building located in the business park,

1. The 735 spaces requirement is based on computations by Thornton's Planning Department staff. The record establishes that by any method of calculation Thornton's zoning regulations require substantially more than 505 spaces for a structure of the size and type proposed by Mountain Bell.

appeared at the Thornton Planning Commission hearing and objected to the proposed PUD plan. It argued that the planned Mountain Bell building was incompatible with existing development of the surrounding area and that the building would violate protective covenants applicable to the site. Those covenants allegedly limited the permissible height of any structure and prescribed certain requirements to avoid noise, glare and traffic problems. A planner for the City of Thornton responded that use of the site as a commercial office building was consistent with applicable zoning regulations and the Thornton comprehensive plan. He also stated that the height of the building was necessary to achieve the economies that can be realized by "stacking" of the computers to be installed in the Mountain Bell structure, and that the proposed use of the site would not create a traffic congestion problem. At the conclusion of the hearing the Planning Commission recommended approval of Mountain Bell's application.

Hearings were then held before the Thornton City Council. Tri-State Generation and Transmission Company was again represented at these hearings and was joined by Gerico, Inc., and Frostline, Inc., which also occupied buildings in the Washington Square Business Park. The objectors centered their opposition on the height of the Mountain Bell building, but also argued that adoption of the Mountain Bell PUD proposal would constitute illegal spot zoning. After the hearings the City Council adopted Ordinance No. 887, approving Mountain Bell's application.

Within thirty days from adoption of the rezoning ordinance, Tri-State, Gerico and Frostline (collectively referred to as Tri-State) filed a complaint in district court attacking the validity of the City Council's approval of the Mountain Bell PUD application. Named as defendants were the City of Thornton, Mountain Bell and Washington Square Development Company.[2] The complaint contained three claims for relief, seeking C.R.C.P. 106 review of the City Council's action, a declaratory judgment, and injunctive relief. In its first claim, Tri-State alleged that the City Council's action was arbitrary, capricious, and an abuse of discretion; that the adoption of the rezoning ordinance constituted spot zoning; and that the Council's action effected the grant of a variance, which was beyond its jurisdiction. In the second claim for relief Tri-State alleged that the Thornton PUD ordinance is unconstitutional because it lacks sufficient standards to guide and constrain the Council's review of PUD applications. The third claim for relief alleged that the height of the proposed Mountain Bell building and the provision of only 505 parking spaces in connection with that structure would violate the protective covenants applicable to the site, and requested an injunction to prohibit these violations.

The defendants moved to dismiss Tri-State's complaint, asserting that the City Council and its individual members were indispensable parties, and that the failure to join them within 30 days of the Council's final action as mandated by C.R.C.P. 106(b) required dismissal of the complaint. The trial court denied the motions.

After a hearing on the first two claims for relief, the district court vacated its earlier order denying the defendants' motions to dismiss and entered an order of dismissal.[3] The court found that *Dahman v. City of Lakewood*, Colo.App., 610 P.2d 1357 (1980), a case decided by the Colorado Court of Appeals subsequent to the denial of Tri-State's motions to dismiss, was controlling.

2. At the time of Mountain Bell's PUD application, the subject property was owned by the Washington Square Development Company. Mountain Bell had contracted with the owner to purchase the site, but that contract was contingent upon approval of Mountain Bell's PUD application. On September 24, 1979, Mountain Bell consummated the transaction by purchasing the property. Washington Square Development Company subsequently requested that it be dismissed from the action and the request was granted.

3. Although the order of dismissal purports to dismiss "this case," when read in its entirety it appears that the trial court intended to dismiss only Tri-State's first two claims for relief.

Relying on that case, the trial court concluded that the Thornton City Council was an indispensable party and that the failure to join the Council was a jurisdictional defect requiring dismissal.

Thereafter, Tri-State attempted to amend its complaint to include a fourth claim for relief requesting a declaratory judgment that the Council's Ordinance No. 887 was invalid because the legal description contained in the ordinance failed to describe the subject property accurately and the ordinance did not adequately detail the nature of the PUD project. Tri-State also attempted to add the City Council as a defendant and filed a motion for new trial which asserted various errors including the trial court's dismissal of its action for failure to join an indispensable party.

On July 10, 1980, the trial court conducted a hearing on the plaintiffs' pending motions and took evidence on the breach of protective covenants issue, the third claim for relief in the plaintiffs' complaint. As a result of that hearing, the trial court entered an order rejecting the plaintiffs' argument that the court had erred in dismissing their C.R.C.P. 106(a)(4) claims for failure to join an indispensable party. However, it indicated that the plaintiffs' second claim for relief, which challenged the constitutionality of the Thornton PUD ordinance on its face, might be properly before the court as an independent declaratory judgment action. Consequently, it reserved judgment on the propriety of its earlier dismissal of that claim. The court also reserved judgment on the fourth claim for relief asserted in the plaintiffs' amended complaint. Finally, the court concluded that the proposed Mountain Bell building was not in violation of the protective covenants applicable to the property. The court held that the covenants required only that the proposed development comply with currently applicable city zoning ordinances and receive prior approval by the Washington Square Business Park Architectural Control Committee. Since these requirements had been met, it dismissed the plaintiffs' third claim for relief.

On September 16, 1980, the trial court entered an additional order. With respect to the plaintiffs' fourth claim for relief, the court held that the motion to amend the complaint should be denied as untimely, and that, in any case, the legal description contained in Ordinance No. 887 was adequate. The court next held that the plaintiffs' second claim for relief, challenging the constitutionality of the Thornton PUD ordinance, had been improperly dismissed in its earlier order. It concluded that such a challenge was properly brought pursuant to C.R.C.P. 57 and was not governed by the requirements of C.R.C.P. 106. Although the court believed that there were a number of procedural irregularities as to the plaintiffs' second claim for relief, it elected to deal with the merits of the issue and held that the PUD ordinance was constitutional.

In summary, as a result of its July 21 and September 16 orders, the trial court held: (1) that the plaintiffs' C.R.C.P. 106 claims contained in their first claim for relief were properly dismissed for failure to join an indispensable party; (2) that Tri-State's second claim, requesting a declaratory judgment that the Thornton PUD ordinance was unconstitutional, should be denied; (3) that the plaintiffs' third claim for relief should be dismissed because the Mountain Bell building would not violate the protective covenants applicable to the property; and (4) that the fourth claim for relief should be denied because it was not asserted in a timely fashion and because, in the alternative, it was not a meritorious claim.

The plaintiffs then appealed to this court, challenging each of the conclusions reached by the trial court.[4] We first address the question of whether the district court properly dismissed the plaintiffs' C.R.C.P. 106 claims because of failure to join an indispensable party. We then turn to Tri-State's challenge to the constitutionality of

---

4. The appeal was initially filed in the Colorado Court of Appeals, but was transferred to this court because of the constitutional issue raised

by this case. *See* section 13–4–102(1)(b), C.R. S.1973.

the Thornton PUD ordinance. Finally, we consider Tri-State's contention that the proposed Mountain Bell building violates protective covenants applicable to the site.

## I.

Because the City Council was not named as a defendant within 30 days of the Council's final action on Ordinance No. 887, the trial court concluded that the plaintiffs' C.R.C.P. 106 claims must be dismissed. We agree.

▆▆▆ The general principles of procedure applicable to an action for C.R.C.P. 106(a)(4) review are well established. Unless another period is provided by statute, a proceeding under C.R.C.P. 106(a)(4) to review the actions of an inferior tribunal must be filed not later than 30 days after final action by that tribunal. C.R.C.P. 106(b). In the present case there is no applicable statute specifying a different period of review, so the 30 day time limit is controlling. An action brought under C.R.C.P. 106(a)(4) must be "perfected" as well as filed within this time. E.g., Westlund v. Carter, 193 Colo. 129, 565 P.2d 920 (1977); Board of County Commissioners v. Carter, 193 Colo. 225, 564 P.2d 421 (1977); City and County of Denver v. District Court, 189 Colo. 342, 540 P.2d 1088 (1975). Perfection includes the joinder of all indispensable parties. E.g., Norby v. City of Boulder, 195 Colo. 231, 577 P.2d 277 (1978); Westlund v. Carter, supra; City and County of Denver v. District Court, supra. It is uncontested that the City Council was not joined in the plaintiffs' action within 30 days after the Council adopted Ordinance No. 887. Consequently, if the Council was an indispensable party to a C.R.C.P. 106(a)(4) action seeking review of its decision to grant a PUD application, the trial court was correct in dismissing the plaintiffs' C.R.C.P. 106 claims.

In concluding that the Council was an indispensable party, the trial court relied on Dahman v. City of Lakewood, supra (Dahman). In that case Dahman applied to the Lakewood City Council for a rezoning of his land, and his application was denied. Dahman brought an action for review of the

Council's decision in which he named the individual Council members and the City of Lakewood as defendants, but failed to join the Lakewood City Council as a party within 30 days. The district court denied Dahman relief and he appealed to the Colorado Court of Appeals. That court held that the City Council was an indispensable party to a C.R.C.P. 106(a)(4) action seeking review of its rezoning determination and that the failure to join the Council was not excused by joinder of either the City of Lakewood or the individual members of the Council. It concluded that failure to join the Council was a jurisdictional defect and affirmed the trial court's judgment dismissing the action.

In support of its holding in Dahman the court of appeals relied on our decision in City and County of Denver v. District Court, supra. There, the Denver City Council, acting as a board of equalization, apportioned the cost of a new special assessment district. Affected property owners brought a declaratory judgment action for review of the Council's action, naming only the City and County of Denver and various of its officers as defendants. In an original proceeding before this court, we held that the action should have been brought under C.R.C.P. 106 rather than as a declaratory judgment action and that the City Council was an indispensable party to such an action. Since a proper action naming the City Council as a defendant had not been brought within the applicable time allowed for certiorari review, we held that these defects required dismissal of the complaint notwithstanding attempts to cure the deficiencies by subsequent amendment.

▆▆▆ The plaintiffs recognize that Dahman is directly applicable to the facts of the present case. They contend, however, that Dahman should be overruled. They first assert that City and County of Denver v. District Court, supra, is distinguishable because in that case the Council was performing a state agency function rather than a municipal function. They then assert that where the Council is acting on a zoning matter in its municipal capacity, as in Dahman and the present case, a city and its city

council are alter-egos and that, consequently, joinder of the city is sufficient to perfect an action for certiorari review pursuant to C.R.C.P. 106(a)(4). We find the plaintiffs' arguments unpersuasive.

The plaintiffs read *City and County of Denver v. District Court, supra,* too narrowly. Although the function of a City Council acting as a board of equalization is arguably distinguishable from its function when acting on a zoning matter, the legally significant fact is that both functions are quasi-judicial in nature and so subject to review under C.R.C.P. 106(a)(4). *See Snyder v. City of Lakewood,* 189 Colo. 421, 542 P.2d 371 (1975). Such an action is for the purpose of determining whether the *"inferior tribunal . . .* has exceeded its jurisdiction or abused its discretion." C.R.C.P. 106(a)(4). Consequently, we recognized in *City and County of Denver v. District Court, supra,* that it is this tribunal which must be joined in a certiorari action, and not some other municipal body. That decision did not imply that it was limited to the situation where the Council is acting as a board of equalization, and the court in *Dahman* correctly interpreted our decision in that respect.[5]

Nor do we find the plaintiffs' alter-ego argument persuasive. Although joinder of a city rather than its council may ofttimes achieve a functionally equivalent result, it cannot be assumed that this is always the case. Where review of a city council's quasi-judicial action is sought, it is not unduly burdensome to require that the council be named as a defendant, and it is not an unreasonable or unexpected result in light of the nature of the relief sought and our previous decision in *City and County of Denver v. District Court, supra.*

▪ The plaintiffs also argue that even if the City Council is an indispensable party they should have been allowed to amend their complaint to join the Council notwithstanding expiration of the 30 day time limitation applicable in their case. However, we have repeatedly held that failure to join an indispensable party within the time period for perfecting a C.R.C.P. 106(a)(4) action is a jurisdictional defect not subject to remedy by amendment, and we adhere to that rule in this case. *See, e.g., Westlund v. Carter, supra; Board of County Commissioners v. Carter, supra; Civil Service Commission v. District Court,* 186 Colo. 308, 527 P.2d 531 (1974).[6]

▪ Consequently, we conclude that the trial court acted correctly in dismissing the plaintiffs' C.R.C.P. 106(a)(4) claims.[7]

5. Whether naming the individual members of the city council as defendants in a C.R.C.P. 106(a)(4) review proceeding is the functional equivalent of naming the council itself is a decision we need not make now. *Dahman* held that it was not.

6. The law in this area has been changed by amendment of C.R.C.P. 106, effective July 1, 1981. C.R.C.P. 106(b) now provides, in pertinent part:
 A timely petition or writ may be amended at any time with leave of the court, for good cause shown, to add, dismiss or substitute parties and such amendment shall relate back to the date of filing of the original petition or writ.
 As a result, the failure to join indispensable parties within the 30 day time limit established by C.R.C.P. 106(b) need no longer result in dismissal.

7. Those claims include the plaintiffs' first claim for relief, which was correctly characterized in the plaintiffs' complaint as a C.R.C.P. 106(a)(4) action for review of the City Council's rezoning

determination. In addition, to the extent the plaintiffs assert a constitutional challenge to the Thornton PUD ordinance *as applied* to the Mountain Bell site, their claim for relief is cognizable under Rule 106(a)(4) and must fall along with their other 106(a)(4) claims. The fact that a constitutional issue is raised does not preclude certiorari review. *See Snyder v. City of Lakewood, supra,* 189 Colo. at 427–28, 542 P.2d at 375–376. Rather, the question is whether the act that the aggrieved party seeks to have reviewed is legislative or quasi-judicial. A constitutional challenge to an ordinance as applied is concerned with the application of a general rule or policy "to specific individuals, interests, or situations" and is generally a quasi-judicial act subject only to C.R.C.P. 106(a)(4) review. *Snyder v. City of Lakewood, supra,* 189 Colo. at 427, 542 P.2d at 375. In contrast, as part II of this opinion notes, a facial constitutional challenge concerns a general rule or policy applicable to an open class of individuals and, as such, is generally a legislative act subject to review under C.R.C.P. 57 rather than C.R.C.P. 106(a)(4). Since a party may not seek

## II.

We next address the defendants' assertion that the plaintiffs' entire complaint should have been dismissed. They argue that, since all of the plaintiffs' claims were for review of the Council's decision to grant Mountain Bell's PUD application, all claims should have been brought under C.R.C.P. 106(a)(4) and should have been dismissed because of the failure to join the City Council. We disagree.

■ In their second claim for relief the plaintiffs challenged the constitutionality of the entire Thornton PUD ordinance. Such a challenge implicates the city's actions in a legislative rather than a judicial capacity. *See Snyder v. City of Lakewood, supra.* Therefore, a challenge to the general PUD ordinance is not subject to attack under C.R.C.P. 106(a)(4), and the defendants' contention to the contrary is not well taken. Since the defendants assert no other procedural bar to the plaintiffs' second claim for relief, we will address the merits of that claim in part III of this opinion.

■ Similarly, the plaintiffs' third claim for relief is not a challenge to the Council's Ordinance No. 887 as such. Rather, it is an assertion that, even assuming Ordinance No. 887 is valid, the plaintiffs have independent grounds for blocking the Mountain Bell building on the basis of the private protective covenants applicable to the site. Such an action can be asserted independent of any proceeding for review of the Council's action and the trial court acted correctly in addressing the merits of this claim. We consider this issue in part IV of this opinion.

to accomplish by a declaratory judgment what it can no longer accomplish directly under C.R. C.P. 106(a)(4), *see, Greyhound Racing Association v. Colorado Racing Commission*, 41 Colo. App. 319, 589 P.2d 70 (1978); *Snyder v. City of Lakewood, supra*, the constitutional challenge to the Thornton PUD ordinance as applied in this case must also be dismissed. Finally, the plaintiffs' fourth claim for relief, which was asserted by amended complaint and which challenges Ordinance No. 887 on the basis that it fails to describe the Mountain Bell site accurately and does not set out the conditions of the

## III.

The plaintiffs claim that the Thornton PUD ordinance, Ordinance No. 362, denies them their right to due process and equal protection of the laws because it contains no standards constraining the City Council in their review of a PUD application. We disagree.

■ The Thornton PUD ordinance is a legislative enactment and is presumed valid, *Sundance Hills Homeowners Association v. Board of County Commissioners*, 188 Colo. 321, 534 P.2d 1212 (1975); *Ford Leasing Development Co. v. Board of County Commissioners*, 186 Colo. 418, 528 P.2d 237 (1974). The party assailing the constitutionality of that ordinance has the burden of proving its invalidity beyond a reasonable doubt. *Id.; Board of County Commissioners v. Simmons*, 177 Colo. 347, 494 P.2d 85 (1972). Tri-State has not carried that burden.

The rigidity inherent in traditional Euclidian zoning has led to its increasing supplementation with more flexible zoning devices such as the PUD ordinance adopted by Thornton. *See generally* 2 R. Anderson, *American Law of Zoning* § 11.01 (2d ed. 1976). While traditional zoning establishes fixed uses and requirements applicable to specified areas of the city, the PUD concept allows the municipality to control the development of individual tracts of land by specifying the permissible form of development in accordance with the city's PUD ordinance. *See, Moore v. City of Boulder*, 29 Colo.App. 248, 484 P.2d 134 (1971). Some of the benefits perceived to flow from such regulations include the flexibility necessary

Mountain Bell PUD development plan, also seeks review of a quasi-judicial act and is not properly before this court because of the defect in the plaintiffs' C.R.C.P. 106(a)(4) action. In addition, the trial court denied Tri-State's attempt to assert this fourth claim for relief on the basis that the attempted amendment of the complaint was untimely, and Tri-State does not address this alternative ground of the trial court's decision. Because of these procedural deficiencies we do not address the merits of Tri-State's fourth claim for relief.

to permit adjustment to changing needs, and the ability to provide for more compatible and effective development patterns within a city. 2 R. Anderson, *American Law of Zoning, supra*, §§ 11.01, 11.09, 11.-14.[8] We have previously recognized that planned development ordinances represent a modern concept in progressive municipal planning, *Dillon Companies, Inc. v. City of Boulder*, 183 Colo. 117, 121, 515 P.2d 627, 629 (1973), and have indicated that a properly drafted planned development ordinance is constitutionally permissible. *See Sundance Hills Homeowners Association v. Board of County Commissioners, supra; Ford Leasing Development Co. v. Board of County Commissioners, supra; Dillon Companies, Inc. v. City of Boulder, supra; see also Moore v. City of Boulder, supra.*

■ However, the same flexibility which is the primary virtue of a PUD ordinance also results in a loss of certainty and a concomitant concern with the misuse or abuse of discretionary authority. Consequently, courts have generally required that standards be incorporated into a planned development ordinance in order to protect against arbitrary state action in violation of the right to due process of law. *See* 2 R. Anderson, *American Law of Zoning, supra* §§ 11.08, 11.10, 11.20. Such a requirement, properly applied, does not undercut a desirable degree of flexibility, but serves to ensure that a City Council's enhanced discretion under a planned development ordinance will be guided by proper considerations, and that a benchmark for measuring the Council's action will be available in case of subsequent judicial review. We conclude that a planned development ordinance must contain sufficient standards to serve these twin goals.

As relevant to this point, the Thornton PUD ordinance provides that:

The Planning Commission and the City Council shall consider the following in making their determination [whether to grant an application for a PUD]:

1. Compatibility with the surrounding area.

2. Harmony with the character of the neighborhood.

3. Need for the proposed development.

4. The [e]ffect of the proposed Planned Unit Development upon the immediate area.

5. The [e]ffect of the proposed Planned Unit Development upon the future development of the area.

6. Whether or not an exception from the zoning ordinance requirements and limitations is warranted by virtue of the design and amenities incorporated in the development plan.

7. That land surrounding the proposed Planned Unit Development can be planned in coordination with the proposed Planned Unit Development.

8. That the proposed change to Planned Unit Development District is in conformance with the general intent of the comprehensive master plan and Ordinance # 325 [the general zoning ordinance of Thornton].

9. That the existing and proposed streets are suitable and adequate to carry anticipated traffic within the proposed district and in the vicinity of the proposed district.

10. That existing and proposed utility services are adequate for the proposed development.

11. That the Planned Unit Development creates a desirable and stable environment.

---

8. This flexibility is evidenced in the present case by the general structure of the Thornton Ordinance. Thus, the ordinance does not provide for a PUD district in any particular area of the city, but merely provides for the creation of such a district where appropriate. Further, it does not establish any limitations on the permitted uses in a PUD or on the height of structures located in a PUD. Nor does it prescribe minimum standards concerning off-street parking or property line setbacks. Rather, these matters and other conditions restricting permissible development of the site are determined by the specific provisions of the development plan. This result is accomplished in the Thornton PUD ordinance by proscribing all development in a PUD district except that approved in the development plan.

12. That the Planned Unit Development makes it possible for the creation of a creative innovation and efficient use of the property.

 These criteria provide adequate constraints on the discretion of the City Council and establish a set of standards facilitating meaningful judicial review of the Council's action. The PUD ordinance also requires the submission of extensive materials in connection with the PUD development plan,[9] which serves to enhance both the integrity of Council action and the effectiveness of judicial review. We conclude that the plaintiffs' constitutional attack on the Thornton PUD ordinance was properly rejected by the trial court.

### IV.

Tri-State next contends that the proposed Mountain Bell improvements violate the protective covenants applicable to the Washington Square Business Park because of the building height and the inclusion of only 505 off-street parking spaces. We disagree.

### A.

In support of its argument that the height of the Mountain Bell building would violate the restrictive covenants, Tri-State points to Article II(b) of the covenants, which provides:

Article II—PERMITTED USES AND PERFORMANCE STANDARDS

\* \* \* \* \* \*

9. DEVELOPMENT PLAN. The owner of the land shall submit a development plan to the Planning Commission and when required an application for change of zoning to Planned Unit Development. The development plan shall be prepared by an architect, registered engineer, land surveyor or planning consultant and shall include the following information:

1. Survey of the property, showing existing features of the property, including contours, buildings, structures, trees, bushes, streets, easements, and rights-of-way.
2. Site plan showing proposed building locations, use to which buildings shall be put, and land use areas and distances.
3. Traffic circulation, parking areas, and pedestrian walks.

(b) Building Sites in the appropriate areas, shall be used only as permitted by the existing or as amended City of Thornton Ordinances. However, the [Architectural Control] Committee shall determine in its sole discretion if such uses are in harmony with the purposes and development of Washington Square.

Tri-State contends that this covenant prohibits the construction of a structure that exceeds the height limitations contained in the applicable Thornton zoning ordinance on February 20, 1974, the date the private protective covenants were created, and that the proposed building would exceed those limitations. Mountain Bell and the City of Thornton answer by arguing that the private covenant contemplates amendment of the Thornton zoning ordinances and provides that any structure permitted under such an amended ordinance is automatically permissible under the protective covenants, regardless of the effective date of the amended ordinance or the date of its application to the property covered by the protective covenants. They argue that, as a result, approval of Mountain Bell's PUD application constitutes compliance with the protective covenant.

 We need not address these conflicting interpretations of the covenant at issue since we believe that this covenant is simply inapplicable to the issue of a structure's permissible height. The full text of the covenants contained in Article II is set out

4. Landscaping plans, including site grading, landscaping design.
5. Preliminary drawings for buildings to be constructed, including floor plans, exterior elevations, and sections.
6. Preliminary engineering plans including street improvements, drainage system and public and municipal utility extensions (water, sewer, gas and electric and telephone).
7. Construction sequence and time schedule for completion of each phase for buildings, parking spaces and landscaped area.
8. Assurance of conformity to existing Municipal Codes and Regulations.
9. Such other information or requirements imposed by the Planning Commission and/or City Council.

in the margin.[10] Subsection (a) of Article II indicates that the Article is concerned with permitted uses in the sense of permissible types of "trade, services or activities" on the land, rather than the permissible design or size of a structure housing a particular use. The correctness of this interpretation is reinforced by reference to Article III of the protective covenants. That Article is concerned with improvements to property and covers such topics as building setbacks, off-street parking, landscaping and illumination. Most importantly, it contains a provision specifically covering the design and specifications of any structure erected in the Washington Square Business Park. Construing Articles II and III together, we conclude that Article II concerns only the types of permissible activities in the Park, while Article III governs the specific design characteristics of any structure proposed for the Park. Thus, Tri-State can object to the height of the Mountain Bell building only if it violates the provisions of Article III of the protective covenants. As relevant here, those covenants provide:

Article III—IMPROVEMENTS

\* \* \* \* \* \*

(d) *Buildings*—No building or structure shall be constructed, erected, placed, altered, or permitted on any Building Site until plans and specifications therefore (sic) have been approved in writing by the [Architectural Control] Committee as set forth in Article VII hereof. . . .

Mountain Bell received approval of its proposed structure from the Washington Square Business Park Architectural Control Committee and, consequently, Tri-State's objection to the height of the building on the basis of the protective covenants is not well taken.

B.

Tri-State also asserts that the provision for off-street parking contained in Mountain Bell's PUD plan violates the protective covenants. In support of this contention it relies on Article III(c) of the protective covenants, which provides in pertinent part:

(c) *Parking*—. . . Adequate off-street parking shall be provided by each Owner and Tenant for customers and employees. The location, number and size of parking spaces, driveways, off-street loading, maneuvering space, space for traffic circulation shall be subject to the Committee approval. The minimum standards shall be the total of the following:

(1) One parking space for each 200 square feet of gross floor space in office use.

(2) One parking space for each 1000 square feet of gross floor space in warehouse use.

(3) One parking space for each 600 square feet of gross floor space in light industrial use.

\* \* \* \* \* \*

In the event the City of Thornton parking requirements conflict with the uses listed above or any other uses such as, but not limited to commercial, retail and wholesale, which may be permitted in the Park, the City requirements shall govern.

Tri-State asserts that this covenant establishes the standard for minimum permissible off-street parking, and that, pursuant to the formula contained in Article III(c), the Mountain Bell structure requires the creation of 900 parking spaces. It contends that this covenant is violated by the PUD plan that provides for only 505 parking

---

10. ARTICLE II—PERMITTED USES AND PERFORMANCE STANDARDS

(a) No noxious or offensive trades, services or activities shall be conducted in the Park, nor shall anything be done thereon which may be or become an annoyance or nuisance to the Owners of other Building Sites or their Tenants by reason of unsightliness or the excessive emission of fumes, odors, glare, vibration, gas-es, radiation, dust, liquid waste, smoke or noise.

(b) Building Sites in the appropriate areas, shall be used only as permitted by the existing or an amended City of Thornton Ordinances. However, the Committee shall determine in its sole discretion if such uses are in harmony with the purposes and development of Washington Square.

spaces in connection with Mountain Bell's building.

The trial court apparently concluded that Article III(c) was not violated by the provisions of Mountain Bell's PUD plan because of the covenants' proviso that Thornton parking requirements shall control where they are in conflict with the parking requirements contained in the covenants. We agree.

■ Although the portion of Article III(c) giving controlling effect to Thornton's parking requirements is not artfully drafted, we believe its central purpose is clear: where the city's zoning regulations prescribe permitted uses which do not correspond to the "office use," "warehouse use," or "light industrial use" categories which are the bases upon which minimum parking spaces are to be computed under the protective covenants, the city's zoning regulation parking requirements are to control.

Under Thornton's PUD ordinance, which was in effect when the protective covenants were adopted, the only uses permitted in a PUD district are those prescribed in the approved development plan. A development plan is unique for each individual PUD district, and parking spaces are to be prescribed in each plan. At the heart of the PUD concept is the flexible and individualized treatment of all features of a proposed project, including parking, consistent with the specified criteria by which the Planning Commission and City Council are to be guided in considering each plan for approval. All features of the project, including use and parking facilities, are interdependent elements of the development plan.[11]

■ We conclude that the parking requirements associated with a PUD development must be considered as part of the use of the property in a PUD district and that where, as here, those parking requirements differ from the ones that would be required under the protective covenants there exists the very conflict in requirements contemplated by the covenants. Where such a conflict exists the protective covenants expressly provide that the city's requirements shall govern. The trial court was correct in so holding.[12]

The judgment of the district court is affirmed.

ROVIRA and QUINN, JJ., do not participate.

---

11. The beneficial effects of this flexible approach are illustrated by the parking requirements developed as part of Mountain Bell's proposed project. Because its employees work in shifts, they are not all present at the same time. Therefore, a lesser number of parking spaces will prove adequate than would be the case if all employees worked the same hours. Under the protective covenants, consideration of the reduced parking needs resulting from multiple shifts is not taken into account.

12. Tri-State also argues that the trial court erred in refusing to allow expert testimony concerning the number of parking spaces that would be required for the Mountain Bell building under the terms of Article III(c) of the protective covenants. However, computation of the number of required parking spaces under the covenant formula was not a question that could be resolved only with the assistance of expert testimony. Where the trial court is sitting as a finder of fact and is capable of drawing its own inferences from the facts in the record, it need not admit expert testimony on a matter that it is capable of resolving without such testimony. See C.R.E. 702, Millenson v. Department of Highways, 41 Colo.App. 460, 590 P.2d 979 (1978). In any case, Tri-State was not prejudiced by the exclusion of this evidence since, even if more parking spaces were required by the formula contained in Article III(c) than were required by the City of Thornton, the requirements of the City of Thornton are controlling.