1
 2026 CO 47 Tiffany Kavanaugh in her official capacity as Telluride Town Clerk, Petitioner v. Telluride Locals Coalition Petitioners' Committee; Matthew Hintermeister; Ian Wilson; Daniel Aurand; and Brighton Properties, LLC, a Colorado limitedliability company. Respondents No. 24SC522Supreme Court of Colorado, En BancJune 15, 2026

 Certiorari to the Colorado Court of Appeals Court of Appeals
Case No. 23CA1035

 Attorneys for Petitioner: Nathan Dumm & Mayer P.C.
Nicholas C. Poppe Emily M. Miller Denver, Colorado

 Attorneys for Respondents: Pat Mellen Law, LLC Patricia Ann
 Mellen Denver, Colorado

 West
 Group Law and Policy Suzanne Taheri

 Denver,
 Colorado

 Attorneys for Amicus Curiae Colorado Municipal League: Robert
 D. Sheesley Rachel Bender Denver, Colorado

 JUSTICE BERKENKOTTER delivered the Opinion of the Court, in
 which CHIEF JUSTICE MÁRQUEZ, JUSTICE BOATRIGHT,
 JUSTICE HOOD, JUSTICE GABRIEL, JUSTICE SAMOUR, and JUSTICE
 BLANCO joined.

 OPINION

 BERKENKOTTER, JUSTICE

 ¶1
 The Colorado Constitution vests the legislative power of the
 state in the General Assembly, but it reserves to the people
 the power to propose laws independent of the General Assembly
 by initiative. Colo. Const. art. V, § 1; Vagneur v.
 City of Aspen, 2013 CO 13, ¶ 35, 295 P.3d 493, 504.

 ¶2
 In this case, we consider how the citizen initiative power
 may be used with respect to planned unit developments
 ("PUDs"). Specifically, we consider whether
 Brighton Properties, LLC ("Brighton"), the original
 developer of the Butcher Creek PUD in Telluride—which
 still owns a single lot within the PUD, and a coalition of
 local petitioners may modify the terms of the Butcher Creek
 PUD Agreement ("the PUD Agreement") by initiative
 rather than by amendment.[1]After considering the statutorily
 prescribed method for enabling, creating, and changing a PUD
 agreement, we conclude that the initiative power may not be
 used to amend such an agreement. We therefore conclude that
 Brighton's proposed initiative, which concerned rezoning
 the single lot within the PUD that it still owns, is not
 legislative in character and thus is not subject to
 initiative. Accordingly, we reverse and remand the case to
 the court of appeals with

 directions to remand it to the district court for
 consideration of the reasonableness of the Town of
 Telluride's ("the Town") request for attorney
 fees.

 I.
Facts and Procedural History

 ¶3
 In 1995, pursuant to Colorado's Planned Unit Development
 Act ("PUD Act"), §§ 24-67-101 to -108,
 C.R.S. (2025), the Town approved Butcher Creek, a PUD
 proposed by Brighton. At the time of its approval, the
 Town's PUD enabling ordinance required a PUD application
 to meet certain specialized land use requirements. The
 proposed plan had to conform with the Town's master plan,
 mitigate geological and flood hazards, demonstrate that
 proposed future or existing transportation systems would
 serve the plan, and prove that the plan's site design
 accommodated existing view corridors and open space. Town of
 Telluride, Colo., Land Use Code, art. VI, div. 3, §
 6-313.

 ¶4
 As part of the approval process, Brighton and the Town
 entered into the PUD Agreement. The Agreement bound both
 parties to the conditions of approval; set out the zoning
 restrictions of eighteen specific lots; and set aside Lot A,
 which was designated as a common open space due to the steep
 slopes on its northern boundary. The PUD Agreement also
 contained an "[a]mendments" clause, stating that it
 could not be modified unless all parties (the Town, Brighton,
 and any of their successors) consented. Between 1995 and
 2018, Brighton sought

 seven amendments to the PUD Agreement. Each time, Brighton
 sought to modify the Agreement in a manner consistent with
 its rules and procedures.

 ¶5
 By 2018, Brighton had sold all the lots in the PUD except Lot
 A. That year, Brighton proposed an eighth amendment, one that
 would amend part of Lot A's designation as open space so
 Brighton could construct affordable housing on the southern
 portion of the lot. The Town declined the proposal because
 Brighton had not obtained the consent of all owners within
 the PUD, as required by the amendments clause.

 ¶6
 In 2019, still seeking to develop Lot A, Brighton proposed a
 ballot initiative—amending the PUD Agreement to rezone
 Lot A—to allow for development of the lot. The Town
 rejected this proposed initiative on two grounds. First, it
 found that the proposal involved administrative or
 quasi-judicial matters and was not proper for a ballot
 initiative under Vagneur. Second, the Town reasoned
 that granting Brighton's request for the ballot proposal
 would violate the statutory process for amending PUDs.

 ¶7
 Brighton filed suit, seeking, among other things, a
 declaration that its rezoning initiative was legislative in
 character and thus the proper subject for a ballot
 initiative. Both parties subsequently filed motions for
 summary judgment. Brighton argued, in pertinent part, that
 the initiative constituted a legislative action subject to
 the initiative process. The Town argued, by contrast, that

 amending the PUD Agreement constituted an administrative
 action, and consequently was not subject to the initiative.

 ¶8
The district court denied Brighton's motion. In doing so,
 it pointed to section 24-67-106(3)(b), C.R.S. (2025), which
 requires a locality to first provide notice and a public
 hearing before amending a PUD agreement. The court reasoned
 that the proposed subject of the initiative was
 quasi-judicial, not legislative, making summary judgment
 improper. Further, the court noted that the PUD Agreement,
 which required the Town's consent to any amendment, was a
 binding contract.

 ¶9
The district court simultaneously granted the Town's
 motion for summary judgment on similar grounds. The court
 explained that because the PUD Agreement could be amended, it
 was not "of a permanent or general nature," and
 because it applied only to one lot, it did not "declare
 a new public policy." Once again, the district court
 concluded that the proposed amendment was not legislative in
 character and was thus improper for a ballot initiative.

 ¶10
 Brighton appealed and a division of the court of appeals
 reversed. Telluride Locs. Coal. Petitioners' Comm. v.
 Kavannaugh, 2024 COA 69, ¶ 50, 557 P.3d 381,
 392.[2]Relying heavily on Margolis v. District
 Court, 638 P.2d 297 (Colo. 1981), the division

 held that zoning and rezoning "have long been considered
 legislative matters subject to the initiative power" and
 that "a PUD is a form of zoning or rezoning."
Telluride, ¶ 17, 557 P.3d at 386; see also
Margolis, 638 P.2d at 303-04 ("[O]riginal
 zoning decisions are legislative in character . . . ."
(emphasis added)). The division then concluded that the
 ordinance was legislative because (1) the original
 PUD constituted a permanent zoning decision, which was a
 legislative action; (2) the ordinance declared a new public
 policy regarding the use of Lot A; and (3) the initiative
 served to amend an initial legislative action.
Telluride, ¶¶ 26-27, 557 P.3d at 388.

 ¶11
We granted the Town's petition for certiorari
 review.[3]

 II.
Analysis

 ¶12
 The Town now reiterates its argument that amendments to PUD
 agreements are not legislative in character and thus are not
 subject to the initiative process. It

 contends that although the Town's passage of the PUD
 enabling ordinance constituted legislative activity, it is
 the only act in the three-step PUD process that is
 legislative in character. The Town argues that an amendment
 to an existing PUD agreement is administrative in character
 because it is not of a general or permanent nature. Such an
 amendment, it posits, merely modifies a PUD agreement
 according to the legislative goals already set out in a PUD
 enabling ordinance. An amendment to a PUD agreement thus is
 not subject to initiative. In the Town's view, permitting
 an initiative in this case would allow Brighton to invade the
 Town's administrative authority. We agree.

 ¶13
We begin our analysis by reviewing Colorado's PUD Act and
 summarizing the three steps required to create and amend a
 PUD. We then examine the initiative process and relevant
 standard of review for determining whether a proposed
 initiative is a proper subject of the citizens' power to
 propose laws independent of the General Assembly. We do so by
 asking whether an initiative is legislative in
 nature—and thus a proper exercise of the initiative
 power—or, conversely, whether an act is administrative
 or quasi-judicial in nature and thus not a proper exercise of
 the initiative power. We analyze this question through the
 lens of our prior case law. Then, we turn to Brighton's
 proposed initiative and conclude that it is administrative in
 character and thus not a proper exercise of the initiative
 process.

 A.
 Colorado's PUD Act

 ¶14
 The General Assembly passed Colorado's PUD Act in
 response to recognized shortcomings in traditional Euclidian
 zoning. Tri-State Generation & Transmission Co. v.
 City of Thornton, 647 P.2d 670, 677 (Colo. 1982);
see §§ 24-67-101 to -108. Euclidian
 zoning[4] prescribes fixed uses and requirements to
 a specified area, separating theoretically incompatible land
 uses by establishing rigid legislative rules. Euclidean
 Zoning, Merriam-Webster Dictionary,
 https://www.merriam-webster.com/legal/Euclidean%20zoning
[https://perma.cc/7FHV-ELPJ] ("Euclidean zoning
 [is] a system of zoning whereby a town or community is
 divided into areas in which specific uses of land are
 permitted."); Campion v. Bd. of Aldermen, 899
 A.2d 542, 560-61 (Conn. 2006) (explaining that Euclidean
 zoning is designed to achieve stability in land use planning
 and zoning and is a comparatively inflexible, self-executing
 mechanism).

 ¶15
 A PUD is a more flexible zoning mechanism. It allows a
 municipality[5] to control the development of individual
 tracts of land by specifying the

 development permitted within each tract in accordance with
 the municipality's PUD enabling ordinance. Tri-State
 Generation, 647 P.2d at 677. Consequently, a PUD grants
 municipalities "the flexibility necessary to permit
 adjustment to changing needs, and the ability to provide for
 more compatible and effective development patterns within a
 city." Id. at 677-78. Indeed, section
 24-67-102(1)(i), C.R.S. (2025), of the PUD Act allows
 municipalities to "relate the type, design, and layout
 of residential, commercial, and industrial development to the
 particular site, thereby encouraging preservation of the
 site's natural characteristics."

 ¶16
 The PUD Act sets out a three-step process for creating and
 amending PUDs:

(1) the passage of a PUD enabling ordinance; (2) the
 evaluation of each PUD application to determine if it meets
 the criteria set forth in the enabling ordinance (which, if
 approved, leads to the creation of a PUD and PUD agreement);
 and (3) the amendment, if desired, of the PUD agreement. We
 discuss each of these steps in turn.

 ¶17
 First, before creating a PUD, a municipality must pass a PUD
 enabling ordinance. The enabling ordinance must set forth the
 general development standards with which a PUD must comply.
§ 24-67-104. For instance, it must include the permitted
 density or intensity of land use, minimum number of units or
 acres required, and the sequence of development. §
 24-67-105(1)-(5), C.R.S. (2025).

These standards establish the criteria the municipality will
 apply in evaluating subsequent PUD applications. See
§ 24-67-104(1)(a)-(f), C.R.S. (2025).

 ¶18
 Next, the municipality evaluates each PUD application it
 receives against these prescribed standards. See
§§ 24-67-104, -105. A governing body designated by
 the enabling ordinance reviews PUD applications and, if
 needed, introduces certain conditions for approval. §
 24-67-104(1)(b). The body approves those applications which
 are compliant with the enabling ordinance and the
 municipality and applicant enter into a PUD
 agreement—ultimately creating a PUD. § 24-67-104.

 ¶19
 Finally, if desired, a PUD agreement may be amended so long
 as the changes comply with the procedure set forth in the PUD
 Act. Specifically, the PUD Act prohibits any
 "substantial modification, removal, or release of the
 provisions of the plan" except if, after a public
 hearing, the amendment meets certain statutory criteria.
§ 24-67-106(3)(b). For instance, the amendment must be
 consistent with the entire existing PUD and must not
 substantially harm either the enjoyment of abutting
 properties or the public interest. See Whatley v. Summit
 Cnty. Bd. of Cnty. Comm'rs, 77 P.3d 793, 803
(Colo.App. 2003).

 B.
The Initiative Process

 ¶20
 Article III of the Colorado Constitution provides for the
 separation of powers among the branches of Colorado's
 government. The legislative, executive,

 and judicial branches of government may exercise only their
 own respective powers. Colo. Const. art. III; People v.
 Barth, 981 P.2d 1102, 1105 (Colo.App. 1999). No branch
 may usurp the powers of another. See Vagneur, ¶
 34, 295 P.3d at 503-04.

 ¶21
 The Colorado Constitution vests the legislative power in the
 General Assembly but reserves the power of initiative to the
 people. Colo. Const. art. V, § 1(1)-(2). As noted, the
 people's power of initiative is the power to propose laws
 independent of the General Assembly. Id. We have
 long construed this power to vest only legislative power in
 the people because article V deals only with the legislative
 branch. Vagneur, ¶ 36, 295 P.3d at 504.
Accordingly, the initiative power applies only to acts that
 are "legislative in character." City of Aurora
 v. Zwerdlinger, 571 P.2d 1074, 1076 (Colo. 1977). For
 that reason, based on separation of powers principles, the
 initiative power does not extend to acts that are
 administrative or quasi-judicial. Vagneur, ¶
 36, 295 P.3d at 504.

 ¶22
We review de novo whether a particular citizen initiative is
 legislative in character, and thus a proper exercise of the
 initiative power. Id. at ¶ 32, 295 P.3d at 503.
We have acknowledged that determining whether an initiative
 is legislative is a difficult question to answer, especially
 at the municipal level. Id. at ¶ 38, 295 P.3d
 at 504. Our analysis thus requires us to engage in a
 case-by-case inquiry. Id. at ¶ 48, 295 P.3d at
 507.

 ¶23
We look to case law to guide that analysis. Id. at
 ¶ 44, 295 P.3d at 506. Although we have utilized several
 different tests to determine whether an initiative is
 legislative, "no single test is necessarily controlling;
 rather, the principles underlying those tests must guide the
 overall determination of whether a proposed initiative is
 legislative or administrative." Id. at ¶
 48, 295 P.3d at 507.

 ¶24
We have defined legislative activity as action that is
 permanent and general in nature, often involving a
 declaration of public policy. Zwerdlinger, 571 P.2d
 at 1077. In contrast, we have defined administrative activity
 as action that is "temporary in operation and
 effect" and "necessary to carry out existing
 legislative policies and purposes." Id.

 ¶25
 These definitions have been applied to a variety of
 initiatives. In Zwerdlinger, we held that an
 initiative regarding utility rate ordinances was
 administrative in character because it was temporary, did not
 make new law, and pursued no new policy. Id.
Similarly, in City of Idaho Springs v. Blackwell,
 731 P.2d 1250, 1254-55 (Colo. 1987), we concluded that an
 initiative seeking to select a new site and structure for the
 city hall was administrative because it did "not relate
 to policy declarations of general applicability, and the
 initiative proposal therefore [did] not address matters of a
 permanent or general nature." Instead, the initiative
 was an act "'necessary to carry out' the
 existing legislative policy to build a new city hall."
Id. at 1255 (quoting Witcher v. Canon City,
 716 P.2d 445, 449 (Colo. 1986)).

 ¶26
 Later, we clarified the definitions of legislative and
 administrative activity—sometimes referred to as
 executive acts—in Vagneur. There, we held
 unconstitutional an initiative that sought to overturn a
 city's proposed placement and design of a state highway
 entrance. Vagneur, ¶ 67, 295 P.3d at 511. We
 explained that legislative power is "the promulgation of
 laws of general applicability." Id. at ¶
 46, 295 P.3d at 507. When the government legislates, we
 continued, "it establishes a generally applicable rule
 that sets the governing standard for all cases coming within
 its terms." Id. While legislative acts are
 based on broad policy grounds, "executive acts are . . .
 based on . . . 'individualized, case-specific
 considerations.'" Id. at ¶ 47, 295
 P.3d at 507 (quoting Carter v. Lehi City, 269 P.3d
 141, 154 (Utah 2012)). "Accordingly, decisions that
 require specialized training and experience or intimate
 knowledge of the fiscal or other affairs of government to
 make a rational choice may be properly characterized as
 administrative." Id.

 ¶27
 Applying these definitions in Vagneur, we concluded
 that the proposed initiatives were administrative in nature
 because they "[did] not propose new laws or rules of
 general applicability that set a governing standard."
Id. at ¶ 51, 295 P.3d at 508. Instead, they
 sought "to mandate . . . a specific proposal for the
 location, design, and construction of a state highway
 corridor." Id. We noted that this initiative
 "directly circumvent[ed] a complex and multi-layered
 administrative

 process . . . that entailed case-specific evaluation based on
 careful study and specialized expertise." Id.

 ¶28
We previously considered whether a zoning decision was
 legislative in character, and thus a proper subject of an
 initiative, in Margolis. 638 P.2d at 298. There, we
 concluded that "original zoning decisions are
 legislative in character since the act of original zoning is
 of a general and permanent character and involves a general
 rule or policy." Id. at 304-05 (emphasis
 added). An amendatory act of rezoning, we continued, "is
 likewise legislative even though the procedures may entail
 notice and hearing which characterize a quasi-judicial
 proceeding." Id. at 304.

 ¶29
 Notably, however, we have also held that amendments to
 fundamentally contractual agreements are administrative.
See Witcher, 716 P.2d at 451. Unlike an amendment to
 a policy scheme, such as a municipality's original
 zoning, an amendment to a contractual agreement does not
 change a general rule or policy. Id. at 450. It
 changes only the execution, not the substance, of a policy.
In Witcher, we held that an amendment to a
 contractual agreement—a lease—was administrative
 because it "merely carried out the previously
 established policy of transferring all operational and
 maintenance responsibilities for the bridge to a private
 company." Id. at 451.

 ¶30
 With these tests in mind, we turn to consider whether an
 amendment to a PUD agreement is properly characterized as
 legislative or administrative in nature.

 C.
Application

 ¶31
We conclude that an amendment to a PUD agreement is not
 legislative in character and thus is not a proper subject of
 the initiative process. Further, we distinguish this case
 from Margolis insofar as Brighton's initiative
 does not propose an original zoning decision; instead, it
 proposes to amend one specific PUD.

 ¶32
 A municipality's adoption of an enabling ordinance is an
 exercise of its legislative power because it sets forth the
 general terms and criteria for all PUDs within the
 jurisdiction. It is a decision of "broad public
 policy," Zwerdlinger, 571 P.2d at 1077 (quoting
Whitehead v. H & C Dev. Corp., 129 S.E.2d 691,
 696 (Va. 1963)), which establishes rules of general
 applicability and consequently is legislative in character,
 Vagneur, ¶ 63, 295 P.3d at 511.

 ¶33
 Once an enabling ordinance is passed, however, a PUD
 application is reviewed on a site-specific basis to see if it
 conforms with the standards in its enabling ordinance.
See §§ 24-67-104, -105. This process
 enforces preexisting legislative goals—namely, those
 set forth in the municipality's relevant enabling
 ordinance—and marks a shift from acts that are
 legislative in character to those that are administrative in
 character. See Zwerdlinger, 571 P.2d at 1077.

Additionally, a municipality's amendment of existing
 contractual obligations is administrative in nature and not
 subject to initiative because an amendment merely carries out
 existing legislative policy.

 ¶34
 Here, when the Town passed its PUD enabling ordinance, it
 exercised its legislative power: It set a permanent standard
 for PUD applications within the Town. But, when the Town
 reviewed and approved Brighton's PUD application, it
 exercised its administrative power because it was carrying
 out the preexisting legislative goals set forth in the PUD
 enabling ordinance. The Town reviewed the application based
 on case-specific considerations that require specialized
 knowledge. For instance, the Town reviewed if the PUD
 application included "[a] summary of environmental
 conditions addressing, at a minimum, soil types and bearing
 capabilities; geologic hazard areas; high groundwater tables;
 slope steepness and potential erosion problems; flood prone
 areas; [and] impacts on existing fish, wildlife,
 vegetation[,] and wetland designations." Town of
 Telluride, Colo., Land Use Code, art. VI, div. 3, §
 6-306.F. The PUD Agreement reflected these considerations in
 its terms.

 ¶35
 By attempting to override the proper procedure to amend the
 PUD Agreement, Brighton invaded the Town's administrative
 authority. Much as in Vagneur, Brighton sought to
 circumvent a "complex and multi-layered administrative
 process," ¶ 51, 295 P.3d at 508, by using the
 initiative power to

 sidestep the requirements set forth in the PUD Agreement so
 it could develop land set aside in the PUD as open space.

 ¶36
We additionally conclude that the division's reliance on
 Margolis is misplaced. To be sure, a PUD is a form
 of zoning. Even so, the initiative at issue here does not
 seek to change an original zoning decision.
Margolis, 638 P.2d at 304. Instead, the initiative
 seeks to amend a specific PUD agreement to permit
 construction on a single lot that is currently designated as
 open space. The initiative process is not equipped to address
 the complex assessments required by the Town's enabling
 ordinance, such as how to best mitigate geologic hazard areas
 and high groundwater tables or how to maintain transportation
 linkage for adjacent properties. Which is all to say that
 Brighton may not use the initiative power to evade the PUD
 amendment process.

 III.
Conclusion

 ¶37
We conclude that amendments to PUD agreements are not
 legislative in character and, accordingly, are not a proper
 subject of the initiative process. Brighton's proposed
 initiative here is thus administrative in character and not a
 proper subject of the initiative process. For these reasons,
 we reverse and remand the case to the court of appeals with
 directions to remand it to the district court for
 consideration of the reasonableness of the Town's request
 for attorney fees.

---------

[1] Though Brighton and the other
 petitioners are distinct parties, they joined the same briefs
 on appeal below and before this court. Thus, for brevity, we
 refer to these parties as "Brighton."

[2] Consistent with the briefing before
 this court, we spell the Telluride Town Clerk's last
 name—Kavanaugh—with one "n." Below it
 was spelled with two.

[3] We granted certiorari to review the
 following issues:

1. Whether the court of appeals correctly applied this
 court's opinion in Vagneur v. City of Aspen, 295
 P.3d 493 (Colo. 2013), where the court held that government
 land use decisions subject to complex or specialized
 expertise are not ordinarily subject to the power of citizen
 initiatives.

2. Whether Colorado's Planned Unit Development Act
 of 1972, sections 24-67-101 to -108, C.R.S. (2024) ("PUD
 Act"), which delegates regulation of planned unit
 developments to municipalities, can be overridden by the
 power of initiative.

[4] The term "Euclidian zoning"
 comes from Village of Euclid v. Ambler Realty Co.,
 272 U.S. 365, 396 (1926). There, the Supreme Court upheld the
 constitutionality of a zoning scheme that excluded apartments
 and commercial uses from a single-family residential
 district. Id. at 397.

[5] The PUD Act applies to municipalities
 and counties. § 24-67-102(1), C.R.S. (2025). Because
 this case concerns the Town, we focus on the Act as it
 concerns municipalities, though our reasoning here extends to
 counties as well.

---------