2013 CO 13

**Curtis VAGNEUR and Jeffrey Evans, Petitioners**

v.

**CITY OF ASPEN; Kathryn Koch, in Her Official Capacity as City Clerk for the City of Aspen; Karen Goldman, in Her Official Capacity as Administrative Hearing Officer Pursuant to Section 31–11–110(3), C.R.S. (2009); Les Holst; Clifford Weiss; and Terry Paulson, Respondents.**

**Supreme Court Case No. 09SC1022**

Supreme Court of Colorado.

February 11, 2013

Attorneys for Petitioners: Heizer Paul Grueskin LLP, Edward T. Ramey, Denver, Colorado, Wright & LaSalle, LLP, Gary A. Wright, Aspen, Colorado.

Attorneys for Respondents City of Aspen, Kathryn Koch, and Karen Goldman: John P. Worcester, City Attorney, Jim R. True, Special Counsel, Aspen, Colorado.

Attorneys for Respondents Holst, Clifford Weiss, and Terry Paulson: Klein, Coté & Edwards, LLC, Herbert S. Klein, Lance R. Coté, Aspen, Colorado.

Attorney for Amicus Curiae Colorado Common Cause: Holland & Hart, LLP, J. Lee Gray, Greenwood Village, Colorado.

JUSTICE MÁRQUEZ delivered the opinion of the Court.

¶1 We granted certiorari review to consider whether two citizen-initiated proposed ordinances regarding the design and construction of a state highway entrance to the City of Aspen are administrative in character and therefore outside the scope of the initiative power reserved to the people under article V, sections 1(1) and 1(9) of the Colorado Constitution.[1]

1. We granted certiorari review on the following issue:

Whether the court of appeals erred in holding that the petitioners' proposed initiatives are administrative and thus outside the scope of the initiative power under article V, sections 1(1) and 1(9) of the Colorado Constitution.

¶ 2 In 2007, Petitioners Curtis Vagneur and Jeffrey Evans (collectively, "Proponents") submitted two initiative petitions to the Aspen City Clerk regarding the highway entrance to Aspen. Respondents Les Holst, Clifford Weiss, and Terry Paulson (collectively, "Protestors") filed objections to the initiative petitions. Following a hearing, an administrative hearing officer determined that the proposed initiatives sought to ask the electors of Aspen to vote on a change in use of open space to authorize a different entrance to Aspen; to "mandate specifics regarding the design, location, and mitigation measures for that roadway"; and to "mandate the amendment or rescinding of existing documents authorized by the City Council" that conflict with the elements or conditions of the proposed roadway. The hearing officer concluded that the proposed initiatives "intrude[d] on administrative responsibilities of city staff" and therefore were improper subjects of the initiative process.

¶ 3 On review, the district court and the court of appeals affirmed the hearing officer's determination, concluding that the petitions concerned administrative matters and therefore could not be placed on the ballot under the people's initiative power.

¶ 4 We affirm. We hold that the proposed initiatives are administrative in character and therefore are not a proper exercise of the people's initiative power. The proposed initiatives seek to circumvent a complex and multi-layered administrative process for the approval of the location and design of a state highway—a process incorporating both technical expertise and public input and involving not only the City of Aspen, but also the Colorado Department of Transportation and the Federal Highway Administration. Although the Proponents contend that the proposed initiatives are legislative because they propose a change in the use of an easement across City-owned open space to implement the proposed new design, the initiatives fundamentally seek to change the design that was previously approved by the state and federal agencies in the lengthy administrative process required by federal law. In so doing, the initiatives, on their face, rescind "all enactments and authorizations inconsistent herewith," thereby rescinding or amending right-of-way easements previously conveyed by the City in furtherance of that administrative decision. We conclude that these initiatives impermissibly intrude on the administrative power of the City to manage City-owned open space.

## I.  Factual and Procedural History [2]

¶ 5 Colorado State Highway 82 is the primary route through the Roaring Fork River Valley between the City of Glenwood Springs and the City of Aspen. Local debate has continued since the 1960s over whether and how to modify the design of the highway to address high accident rates and reduce traffic congestion. *See Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1092 (10th Cir.2004). The configuration of the highway as it approaches and enters the City of Aspen from the northwest (the "Entrance to Aspen") has been a particularly contentious topic. As the highway approaches the City of Aspen, it travels southeast past the Buttermilk Ski Area before turning slightly north at a roundabout connecting Maroon Creek Road and Castle Creek Road. Under the current alignment, the roadway continues northeast, then winds through two ninety-degree turns ("S-curves") before it connects to Main Street in downtown. The debate over the final section of highway between the roundabout and Main Street has centered on whether to construct

---

**2.**  The facts are undisputed and are derived from the hearing testimony and documents in the record. We note that although the proposed initiatives and the parties' briefing refer to the 1995 Draft Environmental Impact Statement ("DEIS") and the 1998 Record of Decision issued by the Federal Highway Administration and the Colorado Department of Transportation, neither document was made part of the record. However, the 1998 Record of Decision is a public document available online at http://www. coloradodot.info/ projects/SH82/ entrance-to-aspen/ documents/ 1998 ROD.pdf. Additionally, the Colorado Department of Transportation has made available the document "Entrance to Aspen," available at http://www. coloradodot.info/ projects/ SH82/ entrance-to-aspen/ documents/ CityInsert1–29–07.pdf. We take judicial notice of these documents and their contents. *See In re Interrogatory Propounded by Governor Roy Romer on House Bill 91S–1005*, 814 P.2d 875, 880 (Colo.1991).

a more direct alignment of the highway across City-owned property into Main Street (thus eliminating the S-curves); whether to have a two- or four-lane configuration for vehicular traffic; and whether and what type of mass transportation system (bus or light rail) to implement. Many votes have taken place during the last four decades, with no definitive resolution.

## A. Early Evaluation

¶ 6 Because State Highway 82 is part of the National Highway System and receives federal funding, the highway cannot be modified without the participation and approval of both the Colorado Department of Transportation ("CDOT") and the Federal Highway Administration ("FHWA"). *See generally* 42 U.S.C. § 4332 (2006); 23 U.S.C. §§ 106, 302 (2006).

¶ 7 In 1994, CDOT and FHWA, along with elected officials and staff from the City of Aspen and Pitkin County and members of the public, began to research and analyze various options to redesign the Entrance to Aspen. A series of federal highway and environmental laws, including the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–47 (2006), the Department of Transportation Act of 1966, Pub.L. No. 89–670, 80 Stat. 931 (codified as amended in scattered sections of 49 U.S.C. (2006)), and the Federal–Aid Highway Act of 1968, Pub.L. No. 90–495, 82 Stat. 815 (codified as amended in scattered sections of 23 U.S.C. (2006)), set forth the Environmental Impact Statement ("EIS") process required for evaluating proposed design alternatives. Participants in the process included CDOT and FHWA representatives; officials and staff from Aspen, Pitkin County, and Snowmass Village; engineers; and individuals with professional expertise in a variety of disciplines, including air quality, water quality, wildlife, floodplains, archaeological resources, geotechnical studies, and historic preservation. The EIS process involved extensive public input and technical studies and resulted in a series of draft, supplemental, and final environmental impact statements that were released to the public from 1995 to 1997. This process culminated in 1998 with a Record of Decision, which documented FHWA and CDOT's final decision on the Entrance to Aspen project, based on the requirements of NEPA, the Department of Transportation Act of 1966, the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), the 1990 Clean Air Act Amendments, project data, alternatives considered, and public and other agency input, including comments received after the Final Environmental Impact Statement ("FEIS") was published in August 1997. See Colo. Dep't of Transp., *State Highway 82 Entrance to Aspen Record of Decision* (Aug.1998), http://www.coloradodot. info/projects/SH82/entrance-toaspen/ documents/1998ROD.pdf.

¶ 8 In 1995, the EIS process participants, with input from citizens, established ten community project objectives for the Entrance to Aspen: (1) provide a process responsive to local community-based planning efforts, with special attention to limiting vehicle trips into Aspen to create a less congested downtown; (2) provide forecasted transportation capacity for the year 2015 by identifying a combination of travel modes, alignments, and transportation management actions to achieve a stated community goal of limiting year 2015 traffic volumes to levels at or below those of 1994; (3) reduce the high accident rate on Highway 82 and the existing S-curves and provide safety improvements for bicyclists and pedestrians; (4) develop an alternative that minimizes and mitigates adverse impacts by using a process that follows relevant federal law; (5) develop an alternative that fits the character of the community and is aesthetically acceptable to the public; (6) develop an alternative that is financially realistic with respect to current and expected funding levels and programs; (7) develop an alternative that meets the requirements of the 1990 Clean Air Act Amendments; (8) respond to the need for an alternate route for emergency response to incidents within and around Aspen; (9) provide a system that reflects the small town character and scale of the Aspen community and enhances the quality of life for visitors; and (10) provide an alternative that allows for future transit options and upgrades.

¶ 9 The EIS process participants evaluated numerous proposed alternatives in terms of four main components: alignment (existing, direct, modified direct); lane configuration (two-, three-, four-lane, or a combination of general traffic and dedicated vehicle and/or transit lanes); profile (at grade, below grade, above grade); and mode of traffic (general traffic, high-occupancy vehicle ("HOV"), buses, or light rail). The screening process used progressively more demanding criteria at each level. The screening levels included a reality check, a fatal flaw screening, and a comparative evaluation. The reality check eliminated options that were clearly unrealistic, inappropriate, or unreasonable. The fatal flaw screening eliminated options that did not meet one or more of the community project objectives. A comparative evaluation eliminated alternatives that were not logical when compared to other available alternatives. Alternatives that passed the comparative screening analysis were carried forward for full evaluation.

¶ 10 In August 1995, a Draft Environmental Impact Statement ("DEIS") was released. The DEIS examined three alternatives between the Buttermilk Ski Area and Maroon Creek Road (Alternatives 1‑3), and seven alternatives between Maroon Creek Road and Main Street in Aspen (Alternatives A–G). Relevant here, Alternative D and Alternative F, which are referenced in the proposed initiatives at issue, were among the alternatives eliminated from further consideration after evaluation in the DEIS. Both Alternative D and F proposed two general highway lanes and two dedicated vehicle and/or transit lanes, with a separate transit envelope for light rail. The Record of Decision reflects that these alternatives were eliminated from further consideration because of a lack of support from the community and the Elected Officials Transportation Committee ("EOTC") and because they did not provide a detailed analysis of the light rail system.

### B. 1996 Voter Authorization for Two–Lane Parkway and Light Rail Corridor

¶ 11 Many of the proposed alternatives in the draft and final environmental impact statements included rerouting the final segment of the highway across City-owned open space (the "Marolt–Thomas property") to connect directly with Main Street and thereby avoid the S-curves.

¶ 12 Under section 13.4 of the Aspen City Charter, the City Council shall not sell, exchange, dispose of, or change the use of real property acquired for open space purposes without first obtaining voter approval. Additionally, section 5.7 of the Charter authorizes City Council, on its own motion, to submit any question to a vote of the people.

¶ 13 In 1996, after the draft and supplemental environmental impact statements had been released, Aspen City Council submitted the following question to the voters of Aspen, citing in its Resolution its power under section 5.7 of the Charter to submit questions to the electorate:

Shall the City Council be authorized to use or to convey to the State of Colorado, Department of Transportation, necessary rights of way across City owned property, including the Marolt Property, acquired for open space purposes, and the Thomas Property, acquired for transportation purposes, for a two lane parkway and a corridor for a light rail transit system (to be constructed when the financing is available); subject to the following?

The light rail transit system shall be built only after adequate financing mechanisms and final design details are identified and approved by a public vote.

The use of the corridor shall be contingent upon environmental and historic resource mitigation measures, including, but not limited to:

A cut and cover tunnel of no less than 400 feet to return to public open space approximately 2 acres or more of Marolt open space.

The return to open space of the portion of State Highway 82 between Cemetery Lane and the Maroon Creek intersection to be abandoned by CDOT.

The acquisition of other deed restricted open space of equal value and equal or

greater acreage to replace any net loss in open space.

An alignment of the transportation corridor which is designed to be as sensitive as possible to the location of the historic Holden Smelting and Milling Complex and Museum.

The total use of open space shall be the minimum possible, consistent with good design.

The design of the proposed bridge shall be sensitive to the environment and community character.

A landscaping plan to include plantings, berms and depressions, and other methods to mitigate environmental and neighborhood concerns along the entire EIS corridor.

A majority of voters approved the question.

## C.  1998 Record of Decision

¶ 14 In 1998, CDOT and FHWA released the final Record of Decision, which set forth the plan the agencies approved for modifying the Entrance to Aspen. The approved plan, referred to in the Record of Decision as the "Preferred Alternative," is a combination of highway and intersection improvements, a transit system, and an incremental transportation management program. The highway component of the Preferred Alternative consists of a two-lane parkway that follows the existing alignment from Buttermilk across a new Maroon Creek bridge and through a roundabout connecting with Maroon Creek Road and Castle Creek Road. After the roundabout, the parkway shifts southeast along a modified direct alignment across the City-owned Marolt–Thomas property, with a "cut and cover" tunnel [3] to reach the lower grade of a new Castle Creek bridge before connecting with Main Street at 7th Street. The transit component of the Preferred Alternative includes a light rail system but allows for phasing. That is, if

local support and/or funding for light rail are not available, the roadway will be developed initially with two dedicated bus lanes (in addition to the two general traffic lanes), with a narrow median or concrete center barrier. If funding and public support is later obtained for the light rail system, the light rail system will be built parallel to the highway and the roadway will be reconfigured to eliminate the dedicated bus lanes and become a two-lane parkway with wide shoulders and a broad, grassy median. The Preferred Alternative chosen by FHWA and CDOT reflected the proposal that the agencies determined best met community needs and desires, fulfilled community project objectives, provided flexibility in future design decisions, and complied with federal transportation and environmental laws. It was the only plan approved by the agencies for development.[4]

## D.  Development Progress

¶ 15 In 1998, shortly before the Record of Decision issued, the City Council passed Resolution No. 61, which approved and authorized the City Manager to execute a binding Memorandum of Understanding ("MOU") with CDOT and FHWA. The MOU's purpose was to "clear the way for early design, Right–of–Way acquisition, and construction on certain components of the project as soon as the Record of Decision [was] signed." [5] The MOU required each party to take action to further the development and construction of the approved plan, and it served as a contract among the parties, subject to amendment only upon written agreement of all the parties.

¶ 16 In 2002, in accordance with the 1996 voter authorization and the 1998 MOU, the City Council passed Resolution No. 34, which approved and authorized the City Manager to convey to CDOT a right-of-way easement

---

3.  As explained by the court of appeals, a cut and cover tunnel is created by "digging a trench, inserting the tunnel structure, and then covering it and revegetating the top to mitigate the taking of open space as required by federal law." *Vagneur v. City of Aspen*, 232 P.3d 222, 224 (Colo.App.2009).

4.  No highway improvement can occur unless it is consistent with the Preferred Alternative or is subsequently evaluated and approved by CDOT and the FHWA through the same process.

5.  Pitkin County entered a separate MOU with CDOT and FHWA relating to the Entrance to Aspen to address issues specific to Pitkin County.

over relevant City-owned open space to construct, operate, and maintain a two-lane parkway and corridor for a light rail system. The conveyance incorporated the identical environmental and historic resource mitigation conditions that were set forth in the 1996 voter authorization. The conveyance also required the two-lane parkway and light rail corridor to be constructed in full compliance with the 1998 Record of Decision. However, as relevant here, the conveyance did not authorize development of two dedicated bus lanes as an interim alternative (as set forth in the Record of Decision) because voters had not previously approved such use of the open space as required by section 13.4 of the Aspen City Charter.[6]

¶ 17 In late 2006, a reevaluation of the Preferred Alternative was completed as required by 23 C.F.R. § 771.129(c) (2006). The reevaluation assessed whether any changes had occurred in the project design concept or scope, and whether any regulatory or environmental changes had occurred since the FEIS and 1998 Record of Decision were published. In 2007, following the reevaluation, CDOT and FHWA confirmed the validity of the Preferred Alternative in the 1998 Record of Decision.

¶ 18 In 2007, the City sought and obtained voter approval for a change in the use of open space conveyed to CDOT to permit the construction of interim dedicated bus lanes between Buttermilk Ski Area and the roundabout at Maroon Creek Road, in accordance with the Preferred Alternative. The ballot question, however, did not request voter approval for a change in use of the open space to permit development of bus lanes across the Marolt–Thomas property between the roundabout and Main Street.

¶ 19 To date, the City and the necessary federal and state agencies have worked together to finance and complete various plan components, including construction of a new Maroon Creek Bridge, the Maroon Creek roundabout, and dedicated bus lanes between Buttermilk Ski Area and Maroon Creek Road. Despite the 1996 voter approval, there has been no further development of the highway segment across the Marolt–Thomas open space between the roundabout and Main Street. Voters have rejected financing proposals for a light rail system and have not approved interim bus lanes on that final segment of the Entrance to Aspen. Nevertheless, the City continues to gauge citizen preference for the various alternatives through public meetings, surveys, and ballot questions.

**E. Initiative Petitions**

¶ 20 In 2007, while the City, CDOT, and the FHWA were moving forward on the Preferred Alternative, Proponents submitted two initiative petitions in accordance with the procedures set forth in sections 31–11–101 through –118, C.R.S. (2012). The petitions seek to enact ordinances for the construction of alternative highway designs for the Entrance to Aspen.

¶ 21 The first petition, referred to as the "Direct Connection–Alternative D," proposes an at-grade road across the Marolt–Thomas open space between the roundabout and Main Street and presents the ballot question as:

> Shall the State of Colorado, Department of Transportation (CDOT) be authorized to construct, operate and maintain a four lane highway configuration consisting of two general highway lanes and two vehicle and/or transit lanes (HOV) with a transit envelope next to the highway lanes on property conveyed to CDOT by the City of Aspen, including the Marolt property?

¶ 22 In a series of "whereas" clauses, the petition refers to Resolution No. 34, which approved the 2002 conveyance to CDOT of right-of-way easements across City-owned property for a two-lane parkway and light

---

6. In November 1999, Aspen voters rejected a ballot question that would have authorized $20 million in bond funding for the light rail system. In May 2001, Aspen voters rejected a question seeking authorization for City Council to convey a right-of-way over the Marolt–Thomas space for a two-lane parkway and dedicated bus lanes until the community supports rail funding. *See* Colo. Dep't of Transp., *Transportation Votes in Aspen and Pitkin County Since 1975,* http://www.coloradodot.info/ projects/SH82/entrance-to-aspen/documents/votesbytopic.pdf (last visited Feb. 6, 2013).

rail corridor in accordance with the 1996 voter authorization; acknowledges the two-lane parkway and light rail corridor design as the Preferred Alternative in the 1998 Record of Decision; and acknowledges the "further specific agreements" between Aspen, CDOT, and FHWA contained in the 1998 MOU. The final "whereas" clause nevertheless declares that a different option, identified in the 1995 DEIS as "Alternative D: Modified Direct Alignment, At–Grade, with Separate Transit Envelope," "is by this action recognized as the preferred alternative of the citizens of Aspen for the Entrance to Aspen."

¶ 23 The text of the proposed ordinance provides that the City of Aspen hereby "authorizes and approves" the conveyance of the City-owned property described in Resolution No. 34 "for the purposes set forth hereinafter and for no other purpose" and "hereby rescinds all enactments or authorizations inconsistent herewith." Section 1 of the proposed ordinance provides that CDOT is "hereby authorized to construct, operate, and maintain a four lane highway configuration which substantially conforms to the design described herein." It requires the highway to be constructed "in full compliance" with the design identified in the 1995 DEIS as "Alternative D: Modified Direct Alignment, At–Grade, with Separate Transit Envelope," consisting of "two general highway lanes and two vehicle and/or transit lanes (HOV) with a transit envelope next to the highway lanes," which shall be "sufficient to facilitate addition of a light rail system at such time as community support and financing become available." It then lists a number of design directives and additional conditions, including those that had been incorporated in the 1996 voter authorization. The proposed ordinance provides that the highway "shall be built after completion of a reevaluation . . . and revised Record of Decision" if required by federal law. See 23 C.F.R. §§ 771.127 & 771.129 (2012). Finally, the proposed ordinance acknowledges that its implementation requires abandonment of the "policy" described in the 1998 Record of Decision, "which employs traffic congestion as a mass transit ridership incentive."

¶ 24 The second petition, referred to as "Modified Direct Connection–Alternative F," is virtually identical to the first petition, except that it proposes a cut and cover tunnel instead of an at-grade roadway. It likewise seeks to "authorize and approve" the conveyance to CDOT of the City-owned property described in the 2002 resolution "for the purposes set forth hereinafter and for no other purpose," and rescinds all enactments or authorizations inconsistent with the proposed ordinance. The final "whereas" clause of the second petition, however, declares that a different design, identified in the 1995 DEIS as "Alternative F: Modified Direct, Cut and Cover Tunnel, with Separate Transit Envelope," "is by this action recognized as the preferred alternative of the citizens of Aspen for the Entrance to Aspen." The text of the proposed ordinance requires the highway to be constructed "in full compliance" with the design identified in the 1995 DEIS as "Alternative F: Modified Direct, Cut and Cover Tunnel, with Separate Transit Envelope," consisting of "two general highway lanes and two vehicle and/or transit lanes (HOV) with a cut and cover tunnel, and a transit envelope next to the highway lanes" which shall be "sufficient to facilitate addition of a light rail system at such time as community support and financing become available." The proposed ordinance includes the same additional design directives and conditions as the first petition, but adds further directives relevant to the cut and cover tunnel.

¶ 25 In sum, as noted above, the four-lane designs identified in Alternative D and Alternative F were eliminated from consideration during the DEIS stage of the process. Instead, the Preferred Alternative approved by CDOT and the FHWA in the 1998 Record of Decision consisted of a two-lane parkway with a corridor for light rail, but allowed for development of dedicated bus lanes pending public support and funding for the development of light rail. In 1996, the voters of Aspen authorized City Council to convey a right-of-way easement to CDOT across the City-owned Marolt–Thomas open space only for a two-lane parkway and light rail corridor. Since that time, voters have not authorized City Council to convey a right-of-way easement for dedicated bus

lanes. The proposed initiatives seek to rescind the voters' 1996 authorization, and, by ordinance, "authorize and approve" the conveyance of a right-of-way easement to construct a four-lane highway configuration (composed of two general traffic lanes and two "vehicle and/or" HOV lanes, while allowing for the future development of light rail)– specifically, a configuration to be built in full compliance with either the design identified in the 1995 DEIS as Alternative D or Alternative F. Both initiatives would, by their plain language, rescind all enactments or authorizations inconsistent with the specific new proposed designs.

### F. Administrative & Judicial Review

¶ 26 The Aspen City Clerk twice expressed concern to the initiatives' proponents that the initiative petitions contained problematic language. Proponents adopted certain technical revisions but ultimately declined to modify the proposals to address the remaining concerns raised by the clerk. Thereafter, Protestors filed written objections to the initiative petitions contending that the proposals (1) contained administrative matters that are not subject to the initiative power; (2) included more than a single subject; and (3) contained misleading ballot titles.

¶ 27 At an administrative hearing to consider the protests, a hearing officer heard a statement from Proponent Evans, as well as testimony from the Aspen Assistant City Manager, the Pitkin County Engineer, and a member of the firm representing the Protestors. In a detailed written ruling, the hearing officer concluded that Proponents' proposed initiatives encroached on prior administrative decisions and future administrative responsibilities of city staff and therefore were not proper matters for the initiative process. The hearing officer found that although it appeared that the "core purpose" of the proposed initiatives was to ask the electors of Aspen to vote on a change in use of open space to authorize

a different entrance to Aspen, it also appeared that a "secondary purpose" of the petition was to "mandate specifics regarding the design, location, and mitigation measures for that roadway." The hearing officer also found that the proposed ordinances mandate the amendment or rescission of documents authorized by City Council because such documents would conflict with the specific elements or conditions of the proposed new roadway. The hearing officer concluded that the proposed ordinances "encroached upon the administrative processes reserved to the administrative staff of the City of Aspen as authorized by City Council," and that "allowing citizens through the initiative process, to either dictate or negate administrative actions normally undertaken by city staff is a misuse of the process" and contrary to the initiative rights established by the Aspen City Charter. The hearing officer declined to sever any impermissible portions of the initiative because Proponents had testified that they believed the conditions were necessary to understand their proposals.[7]

¶ 28 Proponents sought review of the hearing officer's determination in the district court, in accordance with section 31–11–110(3), C.R.S. (2012). The district court agreed with the hearing officer that the proposed initiatives were administrative rather than legislative. The court also concluded that it could not sever the administrative portions without substantially changing the petitions. Although the court suggested that it would be permissible to ask voters to "give their approval to City Council to limit the use of City open space for a four-lane highway, with two of the four lanes dedicated to buses and HOV," it noted that nothing in the petitions, standing alone, would accomplish that, and that it could not alter the petition to do so without rewriting them.

¶ 29 On appeal, the court of appeals affirmed the district court and held that the

---

7. With respect to Protestors' other challenges, the hearing officer reasoned that the petitions contained only a single subject, at least when considered without the administrative conditions and requirements. The hearing officer noted, however, that this issue was moot given that the

petitions were not an appropriate subject for the initiative process. Finally, the hearing officer declined to address the claim that the ballot title was misleading, given that no ballot title had yet been set. These issues are not before us.

subject matter addressed by the proposed initiatives was exclusively administrative. In reaching its determination, the court observed that the proposals sought to "revise the terms of the right-of-way previously conveyed to CDOT." *Vagneur v. City of Aspen,* 232 P.3d 222, 228 (Colo.App.2009). The court concluded that "the design, construction, operation, and maintenance of a specific highway structure designed to accommodate specific traffic uses is not a 'permanent' or general act" appropriate for the initiative process. *Id.* It also concluded that implementation of the proposals would require existing contractual obligations to be rescinded or modified, and that the formation, content, and amendment of contracts to which a city is a party to further its policies "are administrative matters, not suitable for an initiative." *Id.* The court further reasoned that the proposed ordinances are administrative and not legislative in nature because they would "reverse a host of administrative actions and decisions" made not only by the city's administrative staff, but also by at least two administrative agencies, CDOT and FHWA. *Id.* at 229.

¶ 30 The court rejected Proponents' contention that the initiatives were legislative because they sought a change in the use of the right-of-way, noting that the change in use sought was "indeed administrative in character—reconfiguring lanes." *Id.* Finally, the court reasoned that the "mere fact that the City Charter requires voter approval of any proposed conveyance of an interest in open space does not dictate the conclusion that voters may by initiative compel the city to convey a specific right-of-way or that such a measure would be legislative," noting that other sections of the Charter indicate that tasks related to municipal engineering and construction are intended by the city to be viewed as administrative. *Id.*

¶ 31 We granted certiorari review and now affirm the court of appeals.

## II. Standard of Review

¶ 32 Proponents originally challenged the hearing officer's decision pursuant to section 31–11–110, C.R.S. (2012). That provision expresses no standard to guide judicial review of the hearing officer's determination. In this case, the underlying facts are undisputed. Whether a particular citizen initiative is administrative or legislative in character, and therefore a proper exercise of the initiative power, is a legal issue that we review de novo. *See City of Commerce City v. Enclave W., Inc.,* 185 P.3d 174, 178 (Colo.2008) (stating that even when reviewing quasi-judicial proceedings, we may review purely legal issues de novo).

## III. Analysis

¶ 33 A court may not interfere with the initiative process to address challenges to the substantive validity of an initiative before it is actually adopted. *Bd. of Cnty. Comm'rs v. Cnty. Rd. Users Ass'n,* 11 P.3d 432, 438–39 (Colo.2000). However, before an initiative is placed on the ballot, a court does have jurisdiction to determine whether the initiative "exceeds the proper sphere of legislation and instead attempts to exercise administrative or executive powers." *City of Idaho Springs v. Blackwell,* 731 P.2d 1250, 1253 (Colo.1987). Here, the issue is whether Proponents' proposed initiatives address legislative or administrative matters. If the proposed initiatives are administrative, they may not be placed on the ballot pursuant to the people's initiative power. If they are legislative, however, then Proponents have a constitutional right to have the initiatives submitted to the electorate. *McKee v. City of Louisville,* 200 Colo. 525, 534, 616 P.2d 969, 975 (1980). The analysis of whether a particular initiative is legislative or administrative in character is grounded in separation of powers principles.

## A. Powers of Initiative and Referendum

¶ 34 Article III of the Colorado Constitution provides that,

The powers of the government of this state are divided into three distinct departments,—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this

constitution expressly directed or permitted.

This provision reflects the explicit and strict separation of powers in our state constitution: the legislative, executive, and judicial branches of government may exercise only their own powers and may not usurp the powers of another co-equal branch of government.

¶ 35 Article V, section 1 of the Colorado Constitution vests the legislative power of the state in the general assembly, but reserves to the people the twin powers of initiative and referendum—that is, the power to propose laws independent of the general assembly and to enact or reject the same by vote, and the corollary power to approve or reject by vote an act of the general assembly. Colo. Const. art. V, § 1(1); *see also id.* §§ 1(2) (initiative), 1(3) (referendum).

¶ 36 Although we construe these reserved powers broadly, they are not unlimited. *Blackwell,* 731 P.2d at 1253. Because article V of the Colorado Constitution deals singularly with the legislative branch of government, we have long construed article V, section 1 to vest only *legislative* power directly in the people. *City of Aurora v. Zwerdlinger,* 194 Colo. 192, 195, 571 P.2d 1074, 1076 (1977). Accordingly, the initiative and referendum powers reserved by the people under article V apply only to acts that are "legislative in character." *Id.* at 195, 571 P.2d at 1076; *see also Margolis v. Dist. Court,* 638 P.2d 297, 303 (Colo.1981). Indeed, in exercising this legislative power, the people are prohibited by article III from exercising administrative (i.e., "executive") or judicial power. Consequently, the powers of

initiative and referendum do not encompass the right to petition for an election on administrative matters. *Blackwell,* 731 P.2d at 1253. In short, a voter initiative must be a valid exercise of legislative power, rather than executive or judicial power. *See Carter v. Lehi City,* 2012 UT 2, ¶ 18, 269 P.3d 141, 147–48.

¶ 37 The initiative and referendum powers reserved to the people under article V extend "to the registered electors of every city, town, and municipality as to all local,special, and municipal legislation of every character." Colo. Const. art. V, § 1(9); *Cnty. Rd. Users Ass'n,* 11 P.3d at 436. "The manner of exercising said powers shall be prescribed by general laws; except that cities, towns, and municipalities may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation." Colo. Const. art. V, § 1(9).[8]

### B. Legislative Versus Administrative Matters

¶ 38 "Whether a proposed ordinance is legislative or administrative is often a difficult question to answer." *McAlister v. City of Fairway,* 289 Kan. 391, 212 P.3d 184, 193 (2009). Many courts have struggled to create tests to delineate "legislative" and "administrative" measures. The distinction can become particularly challenging at the municipal level because the governing body of a municipality often wields both legislative and executive powers and frequently acts in an administrative as well as a legislative capacity by the passage of resolutions and ordinances. We therefore review our prior case law in order to identify and discuss the principles that underlie our analysis.

---

8. A city charter may not curtail the initiative and referendum powers reserved to the people under the state constitution. *Margolis,* 638 P.2d at 302. However, where the referendum power reserved by a municipal charter exceeds that reserved by the state constitution, the power reserved by the charter is operative and will be given effect. *Zwerdlinger,* 194 Colo. at 195, 571 P.2d at 1076 (citing *Burks v. City of Lafayette,* 142 Colo. 61, 349 P.2d 692 (1960)). Nevertheless, this court has long recognized that to subject to referendum "any ordinance adopted by a city council, whether administrative or legislative, could result in chaos" and bring "the machinery of government to a halt." *Id.* at 196, 571 P.2d at 1076

(quoting *Carson v. Oxenhandler,* 334 S.W.2d 394, 399 (Mo.Ct.App.1960)); *Witcher v. Canon City,* 716 P.2d 445, 452 (Colo.1986). Accordingly, we have required that any broader reservation of referendum powers be expressly stated in a charter. *See Witcher,* 716 P.2d at 453 (refusing to read into a city charter an extension of the referendum power to matters purely administrative in character, given the burden that such an extension would place on the operation of local government); *see also Zwerdlinger,* 194 Colo. at 195–96, 571 P.2d at 1076–77 (interpreting charter provision reserving referendum power to "all ordinances" to be limited to legislative ordinances).

¶ 39 Nearly four decades ago, in *ity of Aurora v. Zwerdlinger*, 194 Colo. 192, 571 P.2d 1074 (1977), we first embraced two tests to determine whether an action taken by a municipal body is legislative or administrative in character. First, we observed that "action[s] that relate[ ] to subjects of a permanent or general character are legislative, while those which are temporary in operation and effect are not"; second, we stated that "acts that are necessary to carry out existing legislative policies and purposes ... are deemed to be administrative, while acts constituting a declaration of public policy are deemed to be legislative." *Id.* at 196, 571 P.2d at 1077. These tests offer guidance in distinguishing administrative acts from legislative ones. In *Zwerdlinger*, for instance, we rejected a referendum petition that attempted to repeal a municipal utility rate ordinance, reasoning that decisions to set public utility rates involve the exercise of discretion and the managerial weighing of factors that are both fluctuating and temporary, such that it would be "impractical, if not impossible, for the general public to appraise them in the absence of specific data, facts and information necessary to arrive at a fair and accurate judgment upon the subject." *Id.* at 197, 571 P.2d at 1077 (quoting *Whitehead v. H & C Dev. Corp.*, 204 Va. 144, 129 S.E.2d 691, 696 (1963)). We further reasoned that an ordinance raising water rates does not propose to make a new law but instead executes a plan already adopted by city council to establish a city-owned water system. Accordingly, we held that the ordinance was "administrative in character" and, therefore, not subject to referendum. *Id.*

¶ 40 Some years later, in *Margolis v. District Court*, 638 P.2d 297 (Colo.1981), we expanded on these general tests to include a presumption that where an original act is legislative, an amendment to that act is likewise legislative. In *Margolis* we examined three municipal zoning and rezoning ordinances. We concluded that under the tests set forth in *Zwerdlinger*, an original act of zoning is legislative because it is of a general and permanent character and involves a general rule or policy. *Id.* at 303–04. We then reasoned that, as a matter of logic, the act of amending the zoning ordinance is likewise legislative. *Id.* at 304. We therefore concluded that zoning and rezoning decisions, no matter the size or number of properties involved, are legislative and thus subject to the powers of initiative and referendum. *Id.* at 305.

¶ 41 Thereafter, in *Witcher v. Canon City*, 716 P.2d 445 (Colo.1986), and *City of Idaho Springs v. Blackwell*, 731 P.2d 1250 (Colo. 1987), we reiterated our tests and refined their application. In *Witcher*, after Canon City officials approved a lease amendment permitting a private entity to operate and improve the Royal Gorge Bridge, city electors sought to challenge the lease amendment by referendum. 716 P.2d at 447. Applying our original two tests, we concluded that the negotiation of the leases and amendments thereto in that case were administrative acts undertaken to carry out the previously established policy decision to transfer operational and maintenance responsibilities for the bridge to a private company. *Id.* at 450–51. We then applied the inverse of the presumption announced in *Margolis* to the disputed lease amendment to conclude that, because the original lease was administrative in character, the challenged amendment was also administrative. *Id.* at 451. We observed in that case that elected city officials are required on a day-to-day basis to make decisions regarding various administrative functions facing the city, including "the proper maintenance of city-owned lands and buildings." *Id.* at 449. To subject such routine decisions to referendum would "result in chaos and bring the machinery of government to a halt." *Id.* (citing *Zwerdlinger*, 194 Colo. at 195, 571 P.2d at 1076); *see also* 5 E. McQuillin, *Municipal Corporations* § 16:54 (3d ed.2004) (noting that courts "have taken cognizance of the ways in which the conduct of government would be seriously hampered were the initiative and referendum to be used to compel or bar 'administrative' acts by elected officials").

¶ 42 The following year, in *Blackwell*, we considered the validity of a proposed initiated ordinance likewise intended to restrict elected city officials from making certain managerial decisions with respect to city property and buildings. 731 P.2d 1250. In that case,

city voters had previously approved an ordinance establishing three percent city sales and use taxes "to be deposited solely in a capitol [sic] improvement fund to be used in the priority of: sewer plant and/or water transmission lines, followed by City Hall construction." *Id.* at 1251. Thereafter, the city council approved a motion that authorized the purchase of certain real property to serve as the site for the city hall and provided for a particular historic building to be relocated to the site and renovated for use as the city hall. *Id.* The city subsequently entered into a contract to purchase the property, and the historic building was moved to the new property. *Id.* A group of protestors filed two petitions for initiated ordinances opposing the project. One proposed ordinance sought to repeal and nullify any measure of the city council appropriating or allocating funds to relocate the historic building or to acquire land for that purpose. *Id.* at 1251–52 & n. 1. The second proposed ordinance directly prohibited the use of any funds available to the City of Idaho Springs for either purpose.*Id.* at 1252 & n.2.

¶ 43 We affirmed the trial court's conclusion that the power of initiative did not extend to the matters in the proposed ordinances, reasoning that, "the selection of the site and structure for the city hall is not a permanent or general act within the meaning of *Witcher* or *Zwerdlinger.*" *Id.* at 1254. We explained that, although the structure is "permanent" in the sense that it will serve as the city hall for an indefinite period of time, "the duration of legislation or the anticipated useful life of a municipal improvement does not completely determine the meaning of permanence when determining whether an ordinance is legislative or administrative." *Id.* Rather, the term "permanent" is used to signify a policy of "general applicability." *Id.* Thus, the proposed ordinances did not meet the first test because they did not concern policy declarations of general applicability, but instead sought to exclude one particular parcel of real estate and one type of structure from the range of choices available to the city council. We further concluded that the proposed initiated ordinances must be classified as administrative under the second test, reasoning that "[t]he choice

of location and structure for the new city hall is an act 'necessary to carry out' the existing legislative policy to build a new city hall" as approved by voters in the earlier ratification of the sales and use taxes. *Id.* at 1255.

¶ 44 As is evident from these cases, our tests have attempted to establish guideposts to aid in determining the overall character of a proposed initiative. We acknowledge, however, that these tests are somewhat elusive, and that, in practice, the classification of a particular ordinance as legislative or administrative has proven to be "largely an ad hoc determination." *See, e.g., Blackwell,* 731 P.2d at 1254; *Witcher,* 716 P.2d at 459 (Lohr, J., dissenting) (noting that whether a city's decision to construct, modify, or purchase any particular improvement is legislative or administrative is a difficult question, and courts have not always taken consistent or reconcilable positions when confronted with these situations); 5 E. McQuillin, *Municipal Corporations,* § 16:56 (3d ed.2004) (noting application of tests has led to opposite conclusions in many jurisdictions). We also have never explained in our decisions the interrelation between the tests or articulated whether a particular matter must be examined under more than one test to reach a determination.

¶ 45 At their core, the tests outlined in our case law are rooted in fundamental principles of separation of powers. In other words, the tests we have articulated seek to discern whether a particular initiative "exceeds the proper sphere of legislation and instead attempts to exercise administrative or executive powers." *Blackwell,* 731 P.2d at 1253.

¶ 46 As recently discussed by the Utah Supreme Court in *Carter v. Lehi City,* 2012 UT 2, 269 P.3d 141, "[t]he true limit on voter initiatives . . . is that they must be a valid exercise of legislative rather than executive or judicial power." *Id.* at ¶ 18, 269 P.3d at 147–48. There, the court acknowledged that it is not possible to mark the precise boundaries of legislative power with bright lines, but that it is possible to describe the "essential hallmarks" of legislative power, as distinguished from executive power. *Id.* at ¶¶ 32–33, 269 P.3d at 151. Legislative

power is defined by the work product it generates, namely, the promulgation of laws of general applicability; when the government legislates, it establishes a generally applicable rule that sets the governing standard for all cases coming within its terms. *Id.* at ¶¶ 34, 36, 269 P.3d at 151–52; *see also Margolis,* 638 P.2d at 304 (observing that a zoning act is legislative in character because it "involves a general rule or policy"). Legislative power is also defined by the nature of legislative decision-making. When a government legislates, it weighs broad, competing policy considerations, not the specific facts of individual cases. *Id.* at ¶ 38, 269 P.3d at 152. Accordingly, although in *Zwerdlinger* we considered a legislative act to be "permanent or general" as opposed to "temporary in operation or effect," 194 Colo. at 196, 571 P.2d at 1077, we clarified in *Blackwell* that our use of the term "permanent" did not hinge on the "duration of legislation or the anticipated useful life of a municipal improvement," but rather, whether the act represented "a declaration of public policy of general applicability," 731 P.2d at 1254.

¶ 47 By contrast, executive acts typically are not based on broad policy grounds, but rather, on "individualized, case-specific considerations." *Carter,* 2012 UT 2 at ¶ 47, 269 P.3d at 154. That is, executive decisions often involve "case-specific evaluation"—not the policy-based promulgation of the rules to be applied. *See id.* Accordingly, decisions that require specialized training and experience or intimate knowledge of the fiscal or other affairs of government to make a rational choice may be properly characterized as administrative. *See McAlister v. City of Fairway,* 289 Kan. 391, 212 P.3d 184, 194 (2009); *see also Town of Whitehall v. Preece,* 1998 MT 53, ¶¶ 29, 35, 288 Mont. 55, 956 P.2d 743, 749–50. Our discussion in *Zwerdlinger* likewise reveals that while executive acts may be necessary to implement the general rules established by legislation, administrative decisions often concern matters involving "specific data, facts and information necessary to arrive at a fair and accurate judgment upon the subject." 194 Colo. at 196–97, 571 P.2d at 1077. Thus, decisions that require careful study and specialized expertise, as well as discretionary judgment, generally are administrative in nature. Additionally, government decisions to enter into a contract with a specific entity are not legislative decisions because they do not involve the adoption of generally applicable rules in the implementation of public policy. Instead, such decisions are executive acts involving specific individual parties and, accordingly, lie beyond the bounds of legislative power. *Carter,* 2012 UT 2 at ¶ 67, 269 P.3d at 158; *see also Witcher,* 716 P.2d at 450 (reasoning that negotiation of leases and amendments thereto between the city and bridge operators were administrative acts not subject to referendum).

¶ 48 Whether a proposed initiative is legislative or administrative remains a case-by-case inquiry. Although we give consideration to each of the tests we have described, no single test is necessarily controlling; rather, the principles underlying those tests must guide the overall determination of whether a proposed initiative is legislative or administrative. Finally, in a close case, a court's decision may be informed by historical examples. That is, "[a]n initiative that finds longstanding parallels in statutes enacted by legislative bodies, for example, may be deemed legislative on that basis, while initiatives that seem more like traditional executive acts may be deemed to fall on that side of the line." *Carter,* 2012 UT 2 at ¶ 53, 269 P.3d at 155.

## IV. Application

¶ 49 Turning to the proposed initiatives in this case, we conclude that they are administrative in character and therefore outside the scope of the initiative power reserved to the people under article V, sections 1(1) and 1(9) of the Colorado Constitution and section 5.1 of the Aspen City Charter.

¶ 50 Proponents contend that their proposed initiatives are legislative, and therefore may be placed on the ballot under the people's initiative power, because they seek a "permanent change in use of specified city-owned real property" akin to a zoning ordinance and because they propose a "new strategic concept" and an "alternate policy" for the transportation corridor at the Entrance

to Aspen. Proponents further argue that the 1996 voter approval of a change in use of City-owned open space was itself a legislative act and that therefore their proposals to rescind or modify that act are also legislative. We are not persuaded.

¶ 51 The initiatives do not propose new laws or rules of general applicability that set a governing standard for all cases coming within their terms. Rather, the proposed initiatives seek to mandate via municipal ordinance a specific proposal for the location, design, and construction of a state highway corridor. In so doing, the proposed initiatives directly circumvent a complex and multi-layered administrative process involving not only the City of Aspen and Pitkin County, but also CDOT and FHWA—a process that entailed case-specific evaluation based on careful study and specialized expertise. The proposed initiatives fundamentally seek to modify or supplant the Preferred Alternative with different proposed designs for the Entrance to Aspen. The proposed initiatives are therefore likewise administrative in nature.

## A. The Proposed Initiatives Seek to Amend or Supplant Administrative Decisions and Actions

¶ 52 Like the powers reserved under the Colorado Constitution, the initiative and referendum powers reserved to the people under section 5.1 of the Aspen City Charter are limited to "legislative" matters.[9] We conclude that the proposed initiatives here concern administrative, not legislative, matters and therefore lie outside the scope of the initiative power.

¶ 53 As set forth above, the history surrounding the Entrance to Aspen reflects that the decision regarding the location and de-sign of a specific state highway is the product of a lengthy, multi-agency administrative process required by federal law. This process reflected case-specific evaluation, specialized knowledge, and technical expertise. In this case, it also required the involvement, cooperation, and action of local, state, and federal agencies and entities, and incorporated extensive public input. The City negotiated contractual agreements and conveyances of specific City-owned property in furtherance of that administrative process and in accordance with its authority to manage City property under section 1.4 of the Charter.[10]

¶ 54 The proposed initiatives seek to replace the design that was approved by the state and federal agencies in this administrative process and mandate the construction of a different design. In other words, the initiatives are "an attempt to reverse administrative decisions of city officials and dictate the future course of such decisions." *Seattle Bldg. & Constr. Trades Council v. City of Seattle*, 94 Wash.2d 740, 620 P.2d 82, 88 (1980) (holding proposed initiative prohibiting the expansion of a highway to be beyond the scope of the initiative power). Under *Witcher*, the proposed initiatives are therefore presumptively administrative as well.

¶ 55 Specifically, the initiatives would authorize CDOT (not the City) to construct, operate, and maintain a highway at the Entrance to Aspen using a design different from that developed by City and county officials and staff and their state and federal counterparts at CDOT and FHWA. The petitions acknowledge the Preferred Alternative set forth in the 1998 Record of Decision, but each declares a different design to be the "preferred alternative of the citizens of Aspen for the Entrance to Aspen." Both initiatives would require the highway to be constructed "in full compliance" with alternative

9. Section 5.1 of the Charter provides:
    (a) Initiative. The registered electors of the City may initiate a proposed ordinance, pursuant to the initiative power reserved by Article V, section 1(9) of the State Constitution, as to any legislative matter which is subject to said legislative power.
    (b) Referendum. The registered electors of the City may require an adopted ordinance to be referred to them at an election, pursuant to the referendum power reserved by Article V, section 1(9) of the State Constitution, to the extent the ordinance constitutes a legislative matter that is subject to said referendum power.

10. Section 1.4 of the Charter provides that, "The City may acquire property within and without its corporate limits for any City purpose ... and may sell, lease, mortgage, hold, manage, and control such property as its interests may require...."

designs identified in the 1995 DEIS, as modified by the additional conditions stated in the proposed ordinances.[11] The first petition seeks to substitute "Alternative D: Modified Direct Alignment, At–Grade, with Separate Transit Envelope" for the Preferred Alternative; the second petition seeks to substitute "Alternative F: Modified Direct, Cut and Cover Tunnel, with Separate Transit Envelope." As noted above, both of these alternatives were eliminated from consideration during the DEIS stage of the administrative process and were never adopted by CDOT or FHWA in conformance with federal requirements.

¶ 56 In addition, the initiatives "authorize and approve" the conveyance to CDOT of a right-of-way across City-owned open space "for the purposes set forth hereinafter and for no other purpose" and automatically rescind "all enactments and authorizations inconsistent herewith." This language necessarily requires the amendment of contractual obligations under the existing MOU between the City and state and federal agencies, as well as changes to right-of-way easements previously conveyed by the City to CDOT in furtherance of the 1996 voter authorization, the Preferred Alternative in the 1998 Record of Decision, and the MOU. Although it would be premature at this point to opine whether those required amendments would generate separate legal problems, it is clear that the initiatives require the City to amend existing contractual obligations. We have held that a city's negotiation of contracts to which it is a party, and amendments to those contracts, are administrative matters not subject to the power of initiative. *See Witcher*, 716 P.2d at 450. That the initiatives require the amendment of existing contractual obligations and as changes to right-of-way easements supports the conclusion that they are administrative in nature.

¶ 57 We note that the mere prospect that a proposed initiative will have administrative consequences or require post-adoption administrative action is not, by itself, dispositive of whether the measure is administrative or legislative. It is not uncommon for legislative acts to require subsequent administrative action for implementation. Nor is it unusual for legislative acts to trigger changes to administrative practices, or to have the effect of reversing or rendering moot prior administrative actions.

¶ 58 The initiatives here, however, are not legislative acts that merely require administrative action to implement them. Despite Proponents' characterization of the initiatives as establishing a "new strategic concept" and an "alternate policy"[12] for the transportation corridor, the initiatives are not, in fact, legislative in character because they do not propose to establish a law of general applicability or a rule that sets a governing standard. As such, the initiatives do not represent the exercise of legislative power.

¶ 59 Importantly, the proposed initiatives seek to replace a highway design that was the culmination of an administrative process—again, not with a generally applicable rule or a new governing standard, but simply with a different highway design. The administrative decisions and actions taken by the City in furtherance of this administrative process are akin to the negotiation and amendment of contractual obligations related to the "maintenance of city-owned lands and buildings" discussed in *Witcher*, 716 P.2d at 449, and the "choice of the location and structure" for a municipal building in *Blackwell*, 731 P.2d at 1254. Because the initiatives seek to modify or replace an essentially ad-

---

11. Indeed, the proposals are difficult, if not impossible, to fully comprehend because they refer to designs contained in documents (for example, the 1995 DEIS) that are not readily available to the public.

12. Proponents contend that the 1998 Record of Decision established a "policy" of using traffic congestion to increase mass transit use and that the proposed initiatives are legislative in character because they purportedly establish a new policy that does not employ traffic congestion. Proponents rely on a single sentence in the 1998 Record of Decision stating that "[t]hough the highway will operate under congestion, this congestion is considered part of the disincentive for single occupancy vehicle (SOV) travel and will increase transit usage." This isolated statement in the 1998 Record of Decision cannot be viewed as legislative policy purportedly amended by the initiatives.

ministrative decision, the initiatives are likewise administrative in character. *See Witcher,* 716 P.2d at 451.

## B. The Proposed Initiatives Do Not Establish or Amend Any Zoning Laws

¶ 60 We reject Proponents' suggestion that proposing a permanent change in use of a specific parcel of City-owned open space is equivalent to modifying a zoning plan and that such a proposed change in use is therefore legislative. *See Margolis,* 638 P.2d at 304–05. As we explained in *Blackwell,* the duration of a proposed measure is not dispositive of whether a proposed ordinance is legislative or administrative; rather, the term "permanent" is used to signify a policy of "general applicability." 731 P.2d at 1254. Moreover, the sale, exchange, conveyance, disposition, or change in use of a particular parcel of city-owned property cannot be analogized to the development of a city-wide zoning plan of general applicability. Such case-specific actions generally do not reflect the exercise of legislative power because they do not necessarily entail the enactment of a zoning ordinance that sets a governing standard for all properties coming within its terms, nor do they necessarily amend any existing zoning ordinance of general applicability. The proposed initiatives at issue here do not establish or amend any zoning laws. Indeed, the change in use effected by the proposed initiatives essentially modifies the nature of a right-of-way conveyed to CDOT across a specific parcel of City-owned property. As the court of appeals observed, "[t]he change in use is indeed administrative in character–reconfiguring lanes." *Vagneur,*

232 P.3d at 229. The determination of the type or scope of a right-of-way easement conveyed to another party across a specific parcel of city-owned property reflects the kind of administrative decision related to the management of municipal infrastructure addressed in *Witcher* and *Blackwell. See Witcher,* 716 P.2d at 449; *Blackwell,* 731 P.2d at 1254.

## C. The 1996 Voter Authorization Was Not Legislative

¶ 61 Proponents also contend that the 1996 ballot question submitted to the voters was itself a legislative matter, and that, because their initiatives seek to amend the 1996 voter authorization, the proposed initiatives are likewise legislative. We disagree.

¶ 62 As previously noted, section 1.4 of the Charter grants to the City the power to manage City property. Under section 13.4 of the Charter, however, City Council must obtain voter approval for the sale, exchange, conveyance, disposition, or change in use of City-owned open space.[13] In 1996, City Council submitted a resolution to Aspen voters pursuant to section 5.7 of the Charter, which authorizes City Council to submit "any question" to a vote of the people.[14] As discussed above, the 1996 resolution sought authorization to use or convey to CDOT necessary rights-of-way across City-owned open space for a two-lane parkway and corridor for light rail. The resolution included, in bullet-point form, a list of conditions which included that the light rail system would be built only after adequate financing and final design details were identified and approved and that use of the transportation corridor would be contingent on several listed envi-

---

**13.** Section 13.4 provides in relevant part:
   **Restrictions on the sale or change in use of property.** Council shall not sell, exchange or dispose of . . . real property acquired for open space purposes, without first obtaining the approval of a majority of the electors voting thereon. Additionally, the city council shall not cause or permit the change in use of the real property acquired for open space purposes, other than for recreational, agricultural or underground easement purposes, without first obtaining the approval of a majority of the electors voting thereon.

**14.** The fact that City Council presented this matter to the voters for their approval does not, by

itself, render the matter legislative. Section 5.7 of the Charter provides, "The council on its own motion, shall have the power to submit at a general or special election any proposed ordinance *or question* to a vote of the people . . . ." (emphasis added). This provision permits City Council to obtain voter input in a number of ways, including by merely proposing questions. The sheer number of votes regarding the Entrance to Aspen over the years demonstrates that City Council has made considerable use of its authority to obtain direct voter feedback on various proposals.

ronmental and historic resource mitigation measures.

¶ 63 City Council's proposed change of use in 1996 was not submitted to voters as a proposed ordinance, as would be required by section 4.6 of the Charter for "legislative enactments," because it did not seek to establish any rule of general applicability. Instead, the 1996 resolution sought the approval required by section 13.4 for a change in use of the open space—in this case, a decision regarding the management of specific City-owned open space made in furtherance of the broader administrative EIS process underway at that time. Section 13.4 of the Charter serves as a check on City Council's actions by granting voters the power to reject a decision by City Council regarding its management of this type of property. However, the power to reject City Council's decisions in such matters does not compel the conclusion that decisions regarding the sale, exchange, conveyance, disposition, or change in use of City-owned open space are necessarily legislative, or that the voters themselves may propose or demand specific land management decisions with respect to City-owned property. In short, although section 13.4 requires the consent of the voters for a change in use of such property, it does not confer a corollary power to mandate a particular change in use.

¶ 64 Thus, the 1996 voter authorization was not a legislative enactment. It was necessary authorization for a change in use and conveyance of a right-of-way easement for the specific purpose of constructing a state highway in accordance with a particular design, namely, a two-lane parkway with light rail. This proposal was submitted for voter authorization in conjunction with a multi-layered administrative process involving local governments and state and federal agencies. City Council's decision to convey particular rights-of-way across specific parcels of City-owned property in furtherance of that administrative process is not itself legislative.

¶ 65 In sum, because the particular stretch of highway at issue here would cross City-owned open space, the voters of Aspen have the power under section 13.4 of the City Charter to reject a particular proposal presented to them by City Council. However, the proposed initiatives here *mandate* a change in use of particular City-owned open space conveyed to CDOT. The fact that City Council is required to obtain approval for a change in use of open space does not mean that the electorate is empowered, through an initiated ordinance, to dictate or compel a particular change in use of City-owned property.

¶ 66 We conclude that these initiatives impermissibly intrude on the administrative power of the City to manage City-owned open space in cooperation with state and federal government agencies. Because the proposed initiatives seek to circumvent a complex and multi-layered administrative process for the approval of the location and design of a state highway, their subject matter is administrative and therefore lies outside the initiative power.

## V. Conclusion

¶ 67 We hold that the citizen-initiated proposed ordinances regarding the design and construction of a state highway entrance to the City of Aspen are administrative in character and therefore outside the scope of the initiative power reserved to the people under article V, sections 1(1) and 1(9) of the Colorado Constitution. Accordingly, we affirm the court of appeals.

JUSTICE COATS dissents, and JUSTICE EID joins in the dissent.

JUSTICE EID dissents, and JUSTICE COATS joins in the dissent.

JUSTICE COATS, dissenting.

¶ 68 While I view our prior attempts to distinguish administrative from legislative action as little more than a license to judicially nullify popularly initiated measures at will, I am presently more concerned that the majority's elaborate justification in this case risks extending that entitlement to the oversight of representative bodies as well. I therefore respectfully dissent and write separately to identify my concerns.

¶ 69 In the last half-century or so, this court has come to recognize a loosely-de-

fined, concededly *ad hoc*, distinction between executive (or administrative) actions and legislative actions, primarily for the purpose of limiting the initiative power reserved to the voters by article V, section 1 of the state constitution. *See City of Aurora v. Zwerdlinger,* 194 Colo. 192, 571 P.2d 1074 (1977); *City of Louisville v. Dist. Court,* 190 Colo. 33, 543 P.2d 67 (1975). In a small handful of decisions (none commanding more than four votes), this court has struck down popularly initiated measures as administrating rather than legislating, largely on the basis of a highly elusive distinction between acts constituting a declaration of public policy themselves and acts merely carrying out existing legislative policies. *City of Idaho Springs v. Blackwell,* 731 P.2d 1250 (Colo.1987); *Witcher v. Canon City,* 716 P.2d 445 (Colo.1986); *Zwerdlinger,* 194 Colo. 192, 571 P.2d 1074; *cf. Margolis v. Dist. Court,* 638 P.2d 297 (Colo.1981) (even "small" zonings and rezonings held legislative in nature). While it in no way makes the classification of such measures any more rational or predictable, we have in the past also observed that an amendment to an original legislative act must also be considered legislative. *Witcher,* 716 P.2d at 450; *Margolis,* 638 P.2d at 304. By subtly expanding this proposition to include its inverse – that an amendment to other-than-legislative acts cannot be legislative – the court of appeals, and now the majority, shifts the focus of the inquiry from the nature of the popular initiative itself to the nature of municipal actions likely to be affected by it.

¶ 70 Although the distinction between administrative and legislative acts may have originally been formulated simply to ensure that popular democracy not interfere with the day-to-day administrative functions of municipalities, like the "purchase of city vehicles, establishment of parking fees, and the proper maintenance of city-owned lands and buildings," *see Witcher,* 716 P.2d at 449, the discretionary power of the judiciary under this doctrine, as this case amply demonstrates, is by no means so limited. In fact, the standards guiding judicial discretion in this context, such as they are, have become so elastic as to make any point-by-point refutation of the majority's analysis virtually pointless. I consider it more worth noting that both the majority and intermediate appellate court rationales finding each of these proposed initiatives to be other than "a declaration of public policy of general applicability," *Blackwell,* 731 P.2d at 1254, rest primarily on the assumption that they involve matters beyond the ken of the voting public and the fact that they would disrupt a number of contractual and administrative · decisions already negotiated by the city with other governments. While these considerations may evidence the inconvenience and perhaps lack of wisdom in fundamentally changing courses at this late date, and might even involve a constitutionally prohibited abrogation of contract, they most certainly do not render the initiatives executive rather than legislative. To even suggest that a constitutionally created, legislative body like the General Assembly or the United States Congress would exceed its authority by enacting laws to overturn administrative actions of the executive branch or curtail the executive's administrative authority in certain areas ·would be unthinkable. *See I.N.S. v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (requiring Congress to abide by its delegation of administrative authority to the Attorney General "until that delegation is legislatively altered or revoked").

¶ 71 Of equal concern to me, however, is the majority's explanation, by reference to the provisions of the Aspen Home Rule Charter, that the proposed initiatives cannot be legislative in nature because the City Council's voter-approved submissions affected by them were not themselves legislative enactments. In this regard, I believe the majority breaks new ground and does so in a way that representative bodies with the authority to legislate, like the Aspen City Council, may come to regret. In addition to the fact that I disagree with the majority's construction of the pertinent Charter provisions, the clear import of its rationale is that the same broad judicial discretion that applies to popular initiatives also governs the question whether an elected representative body has in fact administrated when it was obliged to legislate. While municipal governing bodies

often retain greater flexibility than constitutional legislatures to act both executively and legislatively, even they will presumably remain vulnerable to judicial discretion concerning their enabling authority and choice of procedures.

¶ 72 With regard to Aspen's Home Rule Charter in particular, the majority finds that despite being required to obtain voter approval to change the use of open space, the ultimate decision to make such a change, in the absence of an express specification that open space can be changed only by ordinance, cannot be considered legislative – that is, it cannot be considered the "declaration of public policy of general applicability." *Blackwell*, 731 P.2d at 1254. Whatever may be the proper interpretation of the Charter (which on its face creates a highly differentiated form of government, allocating the administration functions of the city to a city manager and various departments created by ordinance), I do not believe its designation of actions the city council may take only by ordinance can limit the meaning of "legislative" for constitutional purposes. Whether or not the Charter specifies that certain actions must be taken, if at all, only by ordinance, it would be difficult, in light of our prior pronouncements, to equate actions of such great policy import as to completely exceed the power of city government without direct voter approval, with the kind of day-to-day managerial functions thus far held to fall outside the constitutional reservation of popular initiative.

¶ 73 Most importantly, however, the majority's assessment of the validity of popular initiatives based on its classification of those municipal actions likely to be affected by them implies judicial discretion to similarly categorize, and thereby limit, the actions of legislative bodies generally, especially those bodies lacking the flexibility to execute. The Supreme Court has struck down congressional action complying with its constitutional procedural requirements for legislative action as infringing on the executive's power to administrate only with regard to the usurpation of the power of appointment and retention over administrative officers. See *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct.

3181, 92 L.Ed.2d 583 (1986). And even this limited distinction between the respective roles of the executive and legislative branches has not been without controversy. *See id.* at 736, 106 S.Ct. 3181 (Stevens, J., concurring in judgment) (disagreeing with majority's "labeling of the functions assigned to the Comptroller General as 'executive powers' " and instead striking down congressional action only for failing to following legislative procedures); *see also id.* at 759, 106 S.Ct. 3181 (White, J., dissenting); *id.* at 776, 106 S.Ct. 3181 (Blackmun, dissenting); *see generally* Thomas O. Sargentich, *The Contemporary Debate About Legislative–Executive Separation of Powers,* 72 Cornell L.Rev. 430 (1987). Because I believe there to be tremendous overlap in what is appropriately designated administrative and what is appropriately designated legislative, with the former largely defined by the discretion delegated to the executive by the latter; and because I also consider it dangerous for the continued viability of the principle of separation of powers to allocate to the judiciary such unfettered discretion to choose between the two, I would exclude from the legislative function, at most, only the clearest and most basic managerial tasks.

¶ 74 Because I disagree with both the majority's analysis and ultimate conclusion that the popular initiatives at issue here do not involve any public policy of general applicability and therefore are strictly administrative in nature, I respectfully dissent.

I am authorized to state that JUSTICE EID joins in this dissent.

JUSTICE EID, dissenting.

¶ 75 I respectfully disagree with the majority's conclusion that the two citizen-initiated proposed ordinances in this case are administrative in character and therefore outside the scope of the initiative power reserved to the people under article V, sections 1(1) and (1)(9) of the Colorado Constitution. And while I agree with many of the points made by Justice Coats in his dissent, I write separately to emphasize that the proposed initiatives in this case are necessarily legislative in character because they seek to change a 1996

voter initiative that was legislative in character.

¶ 76 The majority discusses at length our jurisprudence on determining whether an initiative is legislative or administrative in character, maj. op. ¶¶ 38–48, describing it as an "attempt[ ] to establish guideposts to aid in determining the overall character of a proposed initiative," *id.* ¶ 44. In this case, however, one of the tests is more than a "guidepost"; rather, it directly addresses and resolves the issue before us. In *Margolis v. Dist. Ct.,* we established that when an original act is legislative, an amendment to that act is necessarily legislative. 638 P.2d 297, 303 (Colo.1981); *Witcher v. Canon City,* 716 P.2d 445, 450 (Colo.1986) (same). The majority briefly details this test, *see* maj. op. ¶ 40, but holds that this "legislative amendment test," *City of Idaho Springs v. Blackwell,* 731 P.2d 1250, 1254 n. 4 (Colo. 1987), does not control the case before us, reasoning that the original 1996 voter-approved question was actually administrative in character, maj. op. ¶¶ 61–66. I disagree.

¶ 77 Under section 13.4 of the Aspen City Charter, the City cannot "sell, exchange, dispose of," or otherwise "permit the change in use of" open space without first obtaining voter approval. In 1996, the Council submitted to the voters a question, which was approved, involving a change in use of the same open space that is at issue in this case. Maj. op. ¶ 13. The two initiatives in this case seek to rescind the approval that was given by the voters in 1996. Therefore, under our precedent, if the 1996 question was legislative in character, the initiatives at issue here are legislative as well.

¶ 78 It is significant that the City Charter requires changes in the status of open space to be determined by a vote of the people. The majority itself admits that section 13.4 *"serves as a check* on [the] City Council's actions by granting voters the power to reject a decision by [the] City Council regarding its management of this type of property." *Id.* ¶ 63 (emphasis added). Under the majority's reasoning, then, the City Charter requires such a "check"—that is, a vote of the people—on a purely administrative matter. But as we have repeatedly held, administrative matters fall outside the initiative power. In my view, it is highly unlikely that the City Charter would expressly require a "check" for a purely administrative matter when such a "check" is not required (or even contemplated) by separation of powers principles. I would take the City Charter's voter-approval requirement for what it is: an implicit recognition that changes in open space are, at least under the City Charter, legislative in character. Of course the voter-approval requirement in and of itself does not mandate a legislative designation, *id.* ¶ 62 n.14, but it is an important factor to be considered along with the expression of policy regarding the use of open space for transportation purposes in the 1996 question. *Id.* ¶ 13. Because the 1996 question was legislative in character, the current initiatives, which seek to undo the 1996 vote, are also legislative in character.

¶ 79 The majority's primary concern appears to be that the proposed initiatives will disrupt the "complex and multi-layered administrative process" that has occurred since the 1996 vote. *See, e.g., id.* ¶¶ 4, 51, 53–59, 66. The majority's concern—that is, the disruption the initiatives will cause to existing transportation development—is an argument that goes to the merits of the initiatives, not to whether they are legislative or administrative in character. *See, e.g., id.* ¶¶ 4, 20–25, 51, 53–56, 65–66. For the foregoing reasons, I respectfully dissent from the majority's opinion.

I am authorized to state that JUSTICE COATS joins in this dissent.